**Affirmed and Majority and Concurring Opinions filed September 12, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00264-CV

---

### WILLIAM M. BISHOP AND PINNACLE POTASH INTERNATIONAL, LTD., Appellants

### V.

### E. BARGER MILLER, III AND REUNION POTASH COMPANY, Appellees

---

## NO. 14-12-00318-CV

---

### REUNION POTASH COMPANY, Appellant

### V.

### WILLIAM M. BISHOP AND PINNACLE POTASH INTERNATIONAL, LTD., Appellees

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-29234**

---

# O P I N I O N

These cross appeals concern the alleged misappropriation of trade secrets relating to a process for mining potash in a particular area of Utah. In its appeal, Reunion Potash Company contends that the evidence is legally insufficient to sustain the jury's finding that it misappropriated trade secrets belonging to William E. Bishop and Pinnacle Potash International, Ltd. In their cross appeal, Bishop and Pinnacle contend that the trial court erred in submitting a proportionate responsibility question, which asked the jury to apportion responsibility for the misappropriation between Reunion and E. Barger Miller III, because there was no evidence to support the question's submission and because it was not properly predicated on a finding of independent conduct by Miller. Although Miller was found liable by the jury and assessed damages by the trial court, he does not join this appeal. We affirm.

## I. Background

About twenty miles outside Moab in southeastern Utah lies a potassium-rich region known as Ten Mile Area. The rights to mine potash, or potassium-containing ore, in this area were originally leased in 1984 by Buttes Resources Company from the United States Bureau of Land Management (BLM).[1] Although the potassium deposits in the area are recognized as quite significant, mining them has long been viewed as problematic in part because of the mild climate (for reasons discussed below, most potassium production occurs in colder climates) and because of the depth underground at which the deposits are found.

Bishop first learned of the Ten Mile Area around 1989, when the engineering firm he worked for at that time, Parsons Brinckerhoff–Kavernen Bau und Betrieb (PB-KBB), undertook on behalf of Buttes an evaluation of solution

---

[1] Buttes Resources' parent company, Buttes Oil & Gas Company, also apparently played a role in investigating the Ten Mile Area for mining potential.

mining techniques which potentially could be utilized in the area. In his position at PB-KBB, Bishop learned from documents provided by Buttes various attributes of the Ten Mile Area potassium deposits, including that they existed at anomalously high temperatures.

Bishop, a geologist and mechanical engineer, possessed considerable experience in the solution mining of minerals contained in underground salt formations. At one point in his career, he also had developed a patented "pipe-in-pipe" or concentric-pipe heat exchanger. While working for PB-KBB and examining the materials from Buttes, Bishop began to formulate a process for "selective" solution mining of the Ten Mile Area. Among the documentation Bishop reviewed was a 1995 report from an outside consultant for PB-KBB, Norbert Gruschow, which concluded that selective solution mining could work in the Ten Mile Area. Selective solution mining involves injecting a mining solution (typically brine) underground and extracting a mineral in a crystallized form that is separated from the mining solution. The solution can then be returned underground. Selective solution mining requires a certain temperature differential between the deposit and the surface. This differs from the basic process, where the mineral is dissolved with the mining solution itself (usually freshwater) and later processed for separation, typically leaving large deposits of salt in retention ponds. When Bishop left his employment with PB-KBB, he negotiated for and obtained the rights to the mining process he was developing, apparently including the rights to the Gruschow report.

Bishop's plan for mining in the Ten Mile Area capitalized on the fact of anomalously high temperatures where high concentrations of potash are found in the area. He envisioned achieving the necessary temperature differential for selective solution mining by using a mostly closed-loop system that included the

pipe-in-pipe heat exchanger that he had designed. Basically, the mining process would entail injecting colder brine through an outer pipe into the high-temp potash deposits where the potash would be dissolved into the brine and then removed through a second pipe that surrounds the first pipe. The colder brine sent into the deposit through the outer pipe would cool the warmer brine carrying the potash in the second pipe, causing "cold-cracking" or the crystallization of the potassium out of the returning brine solution. One supposed economic benefit of such a closed-loop system is that artificial heating and cooling methods would not be required, and the supposed environmental benefits include that neither a continuous feed of fresh water nor large-scale salt-retention ponds would be required.

After leaving PB-KBB, Bishop began to look for potential investors, with an eye toward obtaining the potassium mining rights in Ten Mile Area—then owned by Reunion, a successor-in-interest to Buttes—and developing his plan for mining in the area. Bishop met Miller, a potential investor in the project, and the two formed a partnership. In late 2000, Miller signed a confidentiality agreement before Bishop shared specific information regarding the selective mining process that he had developed. Miller then began soliciting other investors, and he and Bishop entered negotiations with Reunion Industries for the purchase of Reunion Potash and its potash leases in the Ten Mile Area. In 2002, Bishop and Miller signed a letter agreement pledging joint participation in the project.

However, when new investors did not materialize, Miller and Bishop both apparently sought investors on their own. In September 2003, Miller sent Bishop a letter regarding terms for Miller's possible exit from the project. In late 2004 or early 2005, Miller informed Bishop that he (Miller) no longer took any responsibility for the joint project. In June 2005, Miller formed a new company, Carnallite Enterprises, LLC, with other investors. Miller also created a business

4

plan for development of a mining project in the Ten Mile Area. He used this plan in an attempt to sell all or part of the project to BHP-Billiton. Miller also used the business plan to obtain a loan from Texas Community Bank, which he used to purchase Reunion (and its potash lease rights in the Ten Mile Area) on behalf of Carnallite. Miller then became president of Reunion. BHP ultimately rejected all overtures from Miller.

Miller further prepared a series of PowerPoint presentations regarding the possibilities for mining in the Ten Mile Area. He presented or sent these presentations to a number of potential investors, including Gordon Gray, owner of Allied Crude Purchasing. Allied eventually purchased Reunion from Carnallite on March 23, 2007 for $1.25 million. Out of this sum, Carnallite satisfied several accounts payable and made a distribution to shareholders, including to Miller's company, E.B. Miller & Co. After the sale, Miller resigned as president of Reunion but remained as company secretary and continued to act as an agent of Reunion to develop an Operating Plan for the Ten Mile Area leases. Reunion submitted the plan to the BLM, but the BLM rejected it as incomplete. Reunion's president, Gray, testified that Reunion still plans to develop the leases.

Bishop, meanwhile, was discussing investment possibilities with Randy Taylor.[2] During their due diligence review, one of Taylor's employees learned that Carnallite had purchased Reunion. Bishop thereafter filed the present lawsuit, alleging, among other things, fraud and breach of contract against Miller and misappropriation of trade secrets against Miller and Reunion. Bishop also sued on behalf of a purported partnership between himself and Miller. Reunion counterclaimed for misappropriation of trade secrets, among other things. Bishop

_____

[2] Around the time Carnallite was formed, Bishop discussed investment possibilities with Taylor, but nothing came of those initial discussions until later.

5

subsequently assigned his and the purported partnership's interests in the lawsuit to Taylor's company, Pinnacle Potash International, which then became a party to the lawsuit.

At the conclusion of trial, the court submitted a 49-page, 36-question charge to the jury. In response to questions 1 through 4, the jury found that Bishop and Miller formed an equal partnership, Miller failed to comply with his duty of loyalty to Bishop before early 2005, and Bishop was therefore entitled to $1.04 million from Miller. In response to questions 7 and 8, the jury stated that Miller failed to comply with his duty of loyalty to the partnership, and as a result, the partnership was entitled to $2.08 million in damages.[3] The jury next found, in questions 12 through 15, that Miller failed to comply with a confidentiality agreement and a letter agreement and that these failures each resulted in a diminishment in Bishop's interest in the venture of $1.04 million. The jury declined to find, in response to Question 16, that Miller committed fraud against Bishop.

Question 20 inquired whether each item in a list of thirteen pieces of information constituted Bishop's trade secret and also whether "[a] compilation of any or all of the . . . items" was his trade secret. The jury found that three specific items and a compilation were trade secrets. The specific items were no. 5, "[t]he calculations of Mr. Bishop of the temperatures the saturated brine and the concentrations of potassium chloride leaving the well-head of the respective potash beds," no. 9, "[t]he use of a heat exchanger and crystallizer to conserve the natural heat of the potash beds for both (a) the pre-heating of feed water (including spent brine) for injection into the potash deposits to conserve the heat present in the deposit so that more potash will dissolve into the produced brine and (b) the

---

[3] Despite findings in its favor by the jury and the fact that it was a plaintiff in the litigation, the Bishop-Miller Partnership received no award in the final judgment and is not a party to this appeal.

6

cooling of such brine so that potash will crystallize and precipitate out of the brine resulting in spent brine for re-injection," and no. 11, "[t]he economic advantage and environmental benefits of the use of a heat exchanger in a closed loop system in the development of potash beds that exist at anomalously high temperatures." In response to questions 21 and 22, the jury further found that both Miller and Reunion misappropriated Bishop's trade secrets and that Miller was responsible for 80% of the harm caused thereby and Reunion was responsible for 20%. In answering Question 26, the jury found damages proximately caused by the misappropriation to be $1,696,428.55. In response to Question 32, the jury found that none of a list of eight specific items was Reunion's trade secrets.[4]

In its judgment, the trial court stated that "it appears" the jury verdict favored Bishop and that Bishop had assigned his claims to Pinnacle Potash. On that basis, the court awarded Pinnacle $1.04 million in actual damages plus $1,456,929.84 in attorney's fees from Miller for his breaches of contracts (questions 12, 14, and 15). The court further awarded Pinnacle $1,357,142.84 from Miller for the misappropriation of trade secrets (questions 20, 21, 26). Lastly, the court awarded Pinnacle $339,285.71 for misappropriation of trade secrets from Miller and Reunion, jointly and severally. The court also ordered Reunion to pay 12.4% of Pinnacle's court costs and Miller to pay 84.6% of those costs.

As mentioned above, both Reunion, on the one hand, and Bishop and Pinnacle, on the other, filed appeals that have been consolidated. Reunion challenges the legal sufficiency of the evidence on the misappropriation claim,

---

[4] The jury additionally declined to find Miller or Reunion acted with malice or that the Bishop-Miller Partnership owned any trade secrets. The jury did not answer several other questions because they were predicated on positive answers to questions which the jury answered in the negative.

while Bishop and Pinnacle assert error in the jury charge.[5] Miller has not appealed the liability or damages findings against him.

## II. Reunion's Appeal

Reunion raises a single issue in its appeal, challenging the legal sufficiency of the evidence to support the jury's finding that it was liable for the misappropriation of Bishop's trade secrets. Reunion specifically contends that there was insufficient evidence to establish that (1) Bishop owned any trade secrets, (2) Reunion used Bishop's trade secrets, or (3) Bishop suffered damages as a result.

"The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In performing a legal sufficiency review, we must credit favorable evidence if reasonable factfinders could have credited it and disregard contrary evidence unless reasonable factfinders could not have disregarded it. *Id.* "If the evidence . . . would enable reasonable and fair-minded people to differ in their conclusions, then [factfinders] must be allowed to do so." *Id.* at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.* Although the reviewing court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support the verdict, if the evidence allows only one inference, neither fact finder nor the reviewing court may disregard the inference. *Id.* We measure the sufficiency of the evidence according to the charge submitted to the jury. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

---

[5] At times in this opinion, we refer collectively to Bishop and Pinnacle as "Bishop."

## A. Trade Secrets and *In Re Bass*

A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it. *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). "Secret" implies that the information is not generally known or readily available. *Id.* However, the mere fact that knowledge of a product or process may be acquired through inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means. *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782, 788 (1958). Moreover, "[t]he fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements." Restatement (Third) of Unfair Competition § 39 cmt. f. Texas courts condemn the employment of improper means to procure trade secrets. *Sharma v. Vinmar Intern., Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The question is not, "How could he have secured the knowledge?" but "How did he?" *Id.*

A person is liable for disclosure or use of a trade secret if either (1) he discovers the secret by improper means; or (2) his disclosure and use, after properly acquiring knowledge of the secret, constitutes a breach of the confidence reposed in him. *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 769 (1958). To determine whether information constitutes a trade secret, courts apply the following six factors: (1) the extent to which the information is known outside the claimant's business; (2) the extent to which the information is known by employees and others involved in the claimant's business; (3) the extent of the measures taken by the claimant to guard the secrecy of the information; (4) the

value of the information to the claimant and to its competitors; (5) the amount of effort or money expended by the claimant in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *In re Bass*, 113 S.W.3d at 739.[6]

The party claiming a trade secret need not satisfy all six factors because trade secrets do not fit neatly into each factor every time. *Id.* at 740. The status of the information claimed as a trade secret must be determined through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct. *Id.* at 739.

## B. Bishop's Trade Secrets

Reunion first challenges the jury's finding that Bishop owned any particular trade secrets.[7] As set forth above, the jury specifically found three items in a list to be Bishop's trade secrets—(1) temperature calculations for saturated brine and the concentrations of potassium chloride leaving the well-head of the respective potash beds, (2) the use of a heat exchanger and crystallizer to conserve the natural heat of the potash beds for pre-heating feed water for injection into the potash deposits and the cooling of such brine so that potash will crystallize and precipitate out of the brine resulting in spent brine for re-injection, and (3) the economic advantages and

---

[6] In Question 20, the jury was instructed to consider these six *Bass* factors in determining whether a trade secret existed.

[7] Reunion begins its argument by asserting that "Bishop sought overly-broad protection," pointing out that in his testimony, Bishop identified as his trade secrets certain ideas well-known in the mining industry and information clearly known to Reunion, for example, the idea of reentering a previously-drilled wellbore or the nature of his relationship with Reunion. Reunion's assertions, however, oversimplify what Bishop was trying to convey. Bishop was not suggesting that he alone was privy to these concepts and this information but that they were integral parts of his overall scheme for mining in the Ten Mile Area. Moreover, the question in this appeal is whether the evidence was legally sufficient to support *the jury's findings*, not whether Bishop spoke too broadly regarding his trade secret claims.

10

environmental benefits of the use of a heat exchanger in a closed loop system in the development of potash beds that exist at anomalously high temperatures—as well as a compilation of "any or all" of thirteen listed items. Reunion challenges the evidence on each of these items.

### 1. Calculations of Temperature and Concentration

Reunion urges this court to engage in a "nonstandard application" of the *Bass* factors, arguing that Bishop's alleged trade secrets are all derivative of information he gleamed from his review of files belonging to Reunion itself, *i.e.*, the information then belonging to Buttes Resources, Reunion's predecessor corporation, during his employment with PB-KBB. Reunion insists that while Miller may have misappropriated such information from Bishop, Reunion could not have, because it already had "institutional knowledge" of such information or such information was readily ascertainable from its own files.[8]

Reunion specifically points to the first item the jury found to be Bishop's trade secret (item no. 5)—calculations of temperature and constituent concentrations leaving the well-head—as being based purely on information from its files. Reunion further emphasizes that Bishop admitted that the elevated temperatures of the potash beds were not a secret. However, the fact that Reunion presumably knew about the high in-ground temperatures and possessed the data on which Bishop's calculations were based does not mean that it ever undertook those calculations independently or understood their importance in the way that Bishop did. *See K & G Oil*, 314 S.W.2d at 788 (explaining that the mere fact that knowledge may be acquired through inspection, experimentation, or analysis does

---

[8] Essentially, Reunion urges that the sixth of the *Bass* factors, the ease or difficulty with which the information could be properly acquired or duplicated by others, is of paramount consideration in this case. 113 S.W.3d at 739.

not preclude protection from those who would secure that knowledge by unfair means). Bishop testified in detail regarding the importance of these calculations in the mining process he envisioned—that they in effect meant the process would be effective for mining potash (using selective solution mining techniques) in a region where mining had not previously occurred due to mild climate conditions. Reunion does not point to any evidence, and we have discovered none, that it understood the importance of the temperatures and concentrations at the well-head in respect to selective solution mining of potash in the Ten Mile Area.

In its reply brief, Reunion additionally points out that the jury specifically found Bishop's *calculations* of temperature and concentrations to be a trade secret, not his *appreciation* of the importance of those calculations. However, as the jury was instructed, an assessment of the usefulness or importance of a trade secret is often a key part of determining whether trade secret protection should apply. *See In re Bass*, 113 S.W.3d at 739 (identifying the value of the information to the claimant and to its competitors as a factor in determining whether a trade secret exists). Reunion further notes that the jury rejected another of the thirteen listed items (item no. 2) as a trade secret, which read: "As to potash beds 5, 9, and 19, the relative depth, the relative concentrations of potassium chloride, and the importance of the elevated temperatures of the respective beds to the selective solution mining process." Reunion suggests that the jurors' rejection of this item demonstrated they did not believe Bishops' appreciation of the calculations constituted a trade secret. Item no. 2, however, was addressed to the importance of *in-ground* potash bed temperatures and concentrations, not *calculations* of temperature and concentration *at the well-head*, which were addressed in item no. 5. Thus, the jury's finding regarding item no. 2 has no relevance to its finding in regard to item no. 5.

Moreover, the jury was authorized to find a trade secret based on a compilation of more than one of the thirteen listed items. Thus, even if we accepted Reunion's position that Bishop could not claim trade secret protection for the calculations of well-head temperature and concentration, this does not mean that those calculations could not have been part of the compilation of information found by the jury to be a trade secret. *See generally Correa v. Houston Surgical Assistant Servs., Inc.*, No. 14-12-01050-CV, 2013 WL 3958499, at *7 (Tex. App.—Houston [14th Dist.] July 30, 2013, no pet. h.) (mem. op.) ("[C]ompilations of information, even readily available information, may constitute a trade secret.").[9]

Reunion further maintains that Bishop failed to sufficiently identify specific calculations that he claims are his trade secrets. The importance of the calculations in question, however, as explained by Bishop in his testimony, is that they permitted the use of selective solution mining through the process he developed. Reunion does not explain why Bishop would have needed to identify specific numbers in the record when he testified regarding the nature of the calculations and their importance to the mining process he envisioned. This is not a case where a trade secret claimant is making amorphous, generalized claims. A discussion of specific numbers would have added nothing to Bishop's case.[10]

## 2. Heat Exchangers

Reunion next points out that the use of heat exchangers for mining potash

---

[9] The compilation finding will be discussed in more detail below.

[10] Bishop did in fact discuss specific numbers regarding well-head temperatures (150 and 170 degrees), and he stated that the saturation levels were "close to full saturation." Reunion's argument that Bishop did not possess a trade secret regarding the calculations because such information was so readily obtainable from Reunion's own files is inconsistent with Reunion's argument that Bishop did not identify specific information in making his claims.

was not unknown within the industry.  *See, e.g., In re Waste Mgmt. of Tex., Inc.*, 392 S.W.3d 861, 870 (Tex. App.—Texarkana 2013, no pet.) ("A trade secret cannot be a matter of general knowledge in an industry.").  Reunion acknowledges, however, that Bishop's trade secret claim was more specific than just the idea that heat exchangers could be used in mining potash.  Indeed, the jury found that Bishop possessed a trade secret regarding:

> The use of a heat exchanger and crystallizer to conserve the natural heat of the potash beds for both (a) the pre-heating of feed water (including spent brine) for injection into the potash deposits to conserve the heat present in the deposit so that more potash will dissolve into the produced brine and (b) the cooling of such brine so that potash will crystallize and precipitate out of the brine resulting in spent brine for re-injection.

Reunion's industry expert at trial, Kimberly Gordon, testified that the use of a heat exchanger at Ten Mile Area was mentioned in Buttes's files, which Reunion subsequently inherited.[11]  Reunion, however, did not present the Buttes's document where this mention supposedly occurred, and neither Reunion nor Gordon is specific about its content.  In contrast, Bishop testified specifically that his plan for using a heat exchanger was "unique," was not suggested by Buttes, and could provide a significant competitive advantage.[12]  The jury may have discounted Gordon's brief mention and accepted Bishop's more detailed claims regarding his vision for using heat exchangers in mining potash in the Ten Mile Area.  *See City of Keller*, 168 S.W.3d at 819 ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.  They may choose to believe one

---

[11] Gordon stated:  "The use of a heat exchanger to reheat the return brine with the incoming brine is mentioned in . . . Buttes's files" and "I think that's in the study that they presented to the BLM in 1982 or 1984."

[12] Bishop testified in detail regarding his conception of using a heat exchanger under the circumstances presented at Ten Mile Area and as to how he gained inspiration for the idea from working on liquefied natural gas projects utilizing heat exchangers.

14

witness and disbelieve another.").

### 3. Economic Advantage and Environmental Benefits

The jury additionally found that Bishop possessed a trade secret concerning "[t]he economic advantage and environmental benefits of the use of a heat exchanger in a closed loop system in the development of potash beds that exist at anomalously high temperatures." Without citation to the record or authority, Reunion suggests that this claimed secret merely shows Bishop's knowledge of common uses and benefits for using heat exchangers. In his testimony, Bishop compared the mining method he devised to those in use in other potash mines, emphasizing the economic and environmental benefits of his approach. He also testified to the uniqueness of his ideas. The jury was entitled to accept his statements.

### 4. Compilation

Lastly, Reunion challenges the jury's finding that a compilation of more than one of the thirteen items listed in Question 20 constituted Bishop's trade secret. Reunion specifically asserts that Bishop failed to "put on any evidence of what exactly went into [his] claimed combination of non-secret and secret information." Reunion itself, however, speaks in generalities and offers no analysis of Bishop's considerable testimony and other evidence regarding his plan for mining potash in the Ten Mile Area using a selective solution process he developed. Bishop explained the process in detail to the jury, told jurors why and how it was unique in the industry and would provide a competitive advantage, and even played an animation for the jury showing how the process worked. Reports Bishop prepared in 1998 and 2001 explaining the process were presented into evidence, and Bishop's expert, Kenneth Mills, also testified regarding the value of Bishop's plan, stating "I'm saying the sum of the parts is worth more than the

15

individual parts. And it doesn't mean that the sum has to include every one of the parts."[13] Reunion's complaints regarding a lack of evidence are without merit.

## 5. The *Bass* Factors

Turning to the six factors from *In re Bass*,[14] there was evidence supporting the conclusion that Bishop took efforts to keep the mining process he designed secret by having those he shared it with sign confidentiality agreements, and he specifically testified that his design was not a known application of technology within the industry. Bishop also testified directly regarding the considerable value such a process could provide in the industry, permitting economical and environmentally-friendly cold-cracking in climates where such methods are generally considered cost-prohibitive. Bishop's two experts also testified regarding the value of his ideas. Although Bishop acknowledged that he only spent approximately one thousand dollars on developing his plan, it is apparent that he spent a considerable amount of his own time and energy in its development. Lastly, there was evidence—particularly that concerning Bishop's own experiences and knowledge-base—on which it could be concluded that his plan could not be readily derived or duplicated by others. The evidence at trial was sufficient to enable reasonable and fair-minded people to determine that Bishop owned certain trade secrets as defined in jury Question 20. *See City of Keller*, 168 S.W.3d at 827.

---

[13] In its appellant's brief, Reunion suggests that, because the jury found only three of the items constituted Bishop's trade secrets, the compilation found by the jury could include, at most, only those three items. In its appellee's brief (in response to Bishop's charge issue in his cross-appeal), Reunion argues, however, that the jury's compilation finding could have included any or all of the thirteen items, whether each individual item was found to be a trade secret on its own or not. We agree with Reunion's argument in its appellee's brief. There is nothing in the jury charge that would have precluded the jury from considering all 13 items as components in a compilation rather than just the few items it found separately to be Bishop's trade secrets.

[14] *In re Bass*, 113 S.W.3d at 739. Reunion generally does not discuss the *Bass* factors except to urge a "nonstandard" application of them.

## C. Reunion's Use:

Next, Reunion contends that no evidence established that it, as opposed to Miller, used any trade secret belonging to Bishop. In other words, Reunion argues that any and all of Miller's tortious conduct was in his own interests, or in the interests of Carnallite, and not on behalf of Reunion.

The jury found that Reunion misappropriated a trade secret of Bishop in response to Question 21. In that question, the jury was instructed that to answer affirmatively for either Miller or Reunion, it had to find a secret exists and the party in question used or disclosed it in violation of a confidential or contractual relationship, after acquiring the secret by improper means, or after acquiring the secret with notice the disclosure was improper. The charge further instructed that

> "Use" of a trade secret means commercial use by which a person seeks to profit from the use of the secret. Standing alone, mere receipt of information does not establish commercial use.

> "Improper means" of acquiring another's trade secrets include the theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case.

> You are instructed that Reunion Potash is responsible for the conduct of Miller if:

> > a) Miller was an employee of Reunion Potash and was acting in the course and scope of his employment when he committed such conduct; or

> > b) Miller was an agent of Reunion Potash and was acting within the scope of his actual authority when he committed such conduct.

The parties focus on two categories of possible uses: Miller's negotiations with BHP and Allied and Reunion's submission of a potash mining Operation Plan

17

to the BLM. Reunion acknowledges that prior to Carnallite's acquisition of Reunion on August 8, 2005, "Miller was clearly using information derived from Bishop's documents to develop a business plan for Carnallite and to entice business associates."[15] Reunion also points out that any use of trade secrets by Miller before Carnallite bought Reunion and Miller became Reunion's president could not be ascribed to Reunion. We agree with these two propositions.

### 1. Discussions with BHP and Allied

Reunion further contends that even once Miller was Reunion's president, his alleged use of Bishop's trade secrets was always on behalf of Carnallite, of which he was also president at the same time and which owned Reunion. According to Reunion, it should not be held liable for any use of trade secrets because it was no more than a commodity or asset that Miller attempted to sell on behalf of Carnallite, first to BHP and then to the ultimate purchaser, Allied.

Post-August 8, 2005 correspondence between Miller and BHP representatives, however, reveals that even though Miller typically represented himself as Carnallite's president, the focus of the negotiations was the development of the mineral leases owned by Reunion. The evidence further shows that Miller used information the jury found to be Bishop's trade secrets in attempting to entice BHP into investing considerable sums of money into the development of these leases, even before any purchase by BHP would occur.[16] Any such development of Reunion's leases would certainly enhance the value of

---

[15] According to his testimony, Miller appears to have been under the impression that he had a legal right to use the information Bishop had developed based on agreements between the two men. This issue was decided against Miller at trial and he has not filed an appeal.

[16] Although Reunion suggests that it was merely an asset Carnallite was to sell to BHP, at least some of the correspondence shows that BHP may have been interested in purchasing Carnallite itself, the parent company.

18

Reunion itself. Because Miller was the president of Reunion and was engaged in negotiations to enhance the value of Reunion leases, the jury reasonably could have concluded that he was acting in the course and scope of his employment as instructed in the jury charge. *See Romero*, 166 S.W.3d at 221 (stating that sufficiency of the evidence is assessed according to the charge given the jury). This is true even though Miller represented himself as an agent of Carnallite. *See, e.g., Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 924 & n.18 (Tex. 2010) (explaining that an agent can represent more than one principal at a time); Restatement (Third) of Agency §§ 3.14 (discussing agency for coprincipals), 3.16 (same); 7.03 & cmt. d(3) (discussing attribution of shared officer's conduct and explaining the presumption officer's conduct should be attributed only to the entity for which he or she purports to be acting in a transaction does not apply when the conduct is tortious). While Carnallite may have benefitted as well had the transaction occurred, it stood to do so, in large part, because of its ownership of Reunion.[17] The evidence supports the conclusion that Reunion, through Miller's conduct as its president in negotiating with BHP, sought to profit from using Bishop's trade secrets.[18]

---

[17] Reunion appears to be urging some form of piercing the corporate veil, suggesting that because, as owner of Reunion, Carnallite would ultimately profit from the enhancement of Reunion's leases, Reunion itself could not be said to benefit from such a transaction. Reunion, however, neither cites authority to support such a proposition, nor cites to any place in the record where it urged this position in the trial court.

Reunion complains in a footnote regarding the fact that the jury was not authorized to assess Carnallite's proportionate responsibility in the charge. Reunion, however, does not raise any point of error regarding this omission. *See Pat Baker Co., Inc. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998) (stating that an appellate court cannot reverse a trial court's judgment on unassigned error). Bishop nonsuited Carnallite as a defendant before trial began.

[18] Miller later used some of the same information to entice Allied to purchase Reunion from Carnallite. We need not consider whether this also was a use by Reunion.

## 2. Submission to BLM

After Allied bought Reunion, Miller continued to work for Reunion as a corporate officer and in cooperating with outside consultants to develop the Operating Plan for submission to the BLM. Reunion contends that while this plan may have had its genesis in Bishop's trade secrets, its creation and submission did not constitute a "use" of Bishop's trade secrets due to important differences between Bishop's work and the plan actually submitted.

In his testimony, Bishop acknowledged that Reunion's Operating Plan did not copy his own plan "in toto"; however, he complained that the Operating Plan was "very similar" and used "major pieces" of the plan he devised, including that: "The well is the same design. The use of the selective solution mining. The recognition that the high temperature allows you to cold crack. The flow rates. The beds leached." *See* Restatement (Third) of Unfair Competition § 40, cmt. c ("The unauthorized use need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability.").[19] Bishop's solution mining expert, Kenneth Mills, broke Bishop's plan into 21 component parts and concluded that Reunion's Operating Plan incorporated 15 of those components and either modified or discarded the remaining six. He further stated that without the "Bishop Plan," "these modifications would never have been done." *See id.* ("[T]he actor need not use the trade secret in its original form. Thus, an actor is liable for using the trade secret with independently created improvements or modifications if the result is

---

[19] The Texas Supreme Court has not expressly adopted the Restatement for all purposes related to trade secrets but has referenced the Restatement, including section 40, on several occasions. *See, e.g., In re Bass*, at 739-40 (examining changes in Restatement at length); *see also Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 438-39 (Tex. App.—Dallas 2012, no pet.) (discussing use of Restatement for trade secrets in Texas and specifically referencing section 40, comment c).

substantially derived from the trade secret.").[20]

Reunion's expert, Gordon, also analyzed the differences between Bishop's plan and the Operating Plan and concluded that Reunion "is not using Mr. Bishop's Plan." She described the two plans as being "fundamentally different." She emphasized that (1) the Operating Plan was contained in one document, while Bishop's ideas were spread over several documents; (2) Bishop's primary focus was potash bed 19, with beds 5 and 9 only of secondary importance, whereas the Operating Plan focuses on beds 5 and 9; (3) the well field design, plant layout, and proposed process flow are different; (4) the proposed heat exchanger is different in the two plans; and (5) Reunion's heat exchanger utilizes a chiller, whereas Bishop believed a chiller was not necessary. Gordon acknowledged there are similarities between the two plans but explained this by pointing out that the plans were aimed at developing the same geographical area.

While Gordon provided the jury with important considerations to guide its analysis, her testimony did not provide conclusive proof that Reunion did not use Bishop's trade secrets in preparing its Operating Plan. Gordon confirmed Bishop's acknowledgement that Reunion did not submit his plan in toto to the BLM as its own Operating Plan; however, she did not directly refute Bishop's contention that major pieces of his plan were included in the Operating Plan. Gordon's testimony also does not refute Mills's conclusion that even the modifications in the Operating Plan were a result of the use of Bishop's trade secrets. The jury had before it both

---

[20] Reunion emphasizes that among the components Mills determined to have been modified in the Operating Plan were the three items the jury found in response to Question 20 to each constitute a trade secret of Bishop. While modification was certainly a factor the jury could have considered in making its determination of "use," it must also be pointed out that the jury found Bishop held a trade secret in a compilation of items and not just in the three individual items. Moreover, Mills emphasized that even the modifications in the Operating Plan would never have been developed if not for the use of Bishop's trade secrets.

Bishop's plan and the Operating Plan, and, guided by the expert testimony, the jury determined that Reunion used Bishop's trade secrets.

The two plans contain many similarities. Bishop and Mills indicated the similarities were due to the fact the Operating Plan was a modified version of Bishop's plan; Gordon explained any similarities as resulting from the fact the plans were aimed at the same goal of mining potash from the Ten Mile Area. Miller acknowledged bringing Bishop's concepts to Reunion and working with outside consultants to prepare the Operating Plan, thus linking it to Bishop's plan. The evidence was such that reasonable and fair-minded people could reach the verdict the jury reached in this case. *See City of Keller*, 168 S.W.3d at 827.

Reunion further suggests that the submission of the Operating Plan to the BLM could not have constituted "commercial use" of Bishop's trade secrets because the BLM rejected the Plan and there is no evidence Reunion has begun mining based on Bishop's plan. As set forth above, the jury charge defined "use" as "commercial use by which a person *seeks to profit* from the use of the secret." (Emphasis added). In submitting its Operating Plan to the BLM, Reunion sought approval to begin moving toward mining for potash in the Ten Mile Area. It was rational for the jury to conclude that in doing so, Reunion was seeking to profit from its use of Bishop's trade secrets. *See, e.g., Sw. Energy Prod. Co. v. Berry-Helfand*, No. 12-11-00370-CV, 2013 WL 3461644, at *24 (Tex. App.—Tyler July 10, 2013, no pet. h.) ("[A] lack of profit from [the] misappropriation and use of the secret will not exempt the wrongdoer from liability in the amount of the trade secret's value when it was misappropriated.").

Reunion urges that something more than this was required, but it cites no cases in support of this argument. The one case it does cite, *Metallurgical Industries, Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1204 (5th Cir. 1986), is

22

distinguishable. In *Metallurgical Industries*, the defendants used a process the plaintiffs claimed violated their trade secrets to modify two of defendants' furnaces. *Id*. at 1197-98. The furnaces were never used for commercial purposes, however, because of a shortage of the scrap material used in the furnaces. *Id*. at 1198. The court held that there had been no commercial use of the trade secrets because the furnaces had never produced anything useable. *Id*. at 1205. The court further stated that if in the future the defendant sought to profit by use or sale of the furnaces, an action for relief might then lie. *Id*. Here, there was evidence on which the jury could rationally conclude Reunion sought to profit by using Bishop's trade secrets in attempting to secure approval to mine the potash leases it owned. *See Sw. Energy Prod.*, 2013 WL 3461644, at *15; *SP Midtown, Ltd. v. Urban Storage, L.P.*, No. 14-07-00717-CV, 2008 WL 1991747, at *7 (Tex. App.—Houston [14th Dist.] May 8, 2008, pet. denied) (mem. op.).[21]

---

[21] In *Southwestern Energy*, evidence demonstrated the defendant oil and gas production company had concluded that drilling in a particular area would not be profitable; however, after it subsequently reviewed—under a confidentiality agreement—a study performed by the plaintiff showing certain "sweet spots" in the region, defendant began acquiring leases in the subject area. 2013 WL 3461644, at *2-3. The court concluded "that it was not unreasonable for the jury to infer [that defendant] used [plaintiff's] data and analysis, not solely to evaluate the . . . prospects, but to plan, map, and lease in preparation for a vast . . . drilling program." *Id*. at *15. Damages in the case were calculated using the "reasonable royalty" approach. *Id*. at *25.

In *SP Midtown*, the court identified as proof of commercial use evidence that defendant contacted two of plaintiff's customers "and tried to persuade them to switch their business." 2008 WL 1991747, at *7. In regards to damages, the court then considered the fact that the two customers had indeed switched their business from plaintiff to defendant. *Id*.

There was evidence at trial in the present case, including the testimony of Allied's president, Gray, that it is still Reunion's goal to gain BLM's approval of a mining process and develop the leases. Gray explained that BLM declined to approve the Operating Plan because it lacked sufficient detail. Gray anticipated that Reunion would have the resources necessary to build the processing plant at the Ten Mile Area.

**D. Damages**

Lastly, Reunion contends that the jury's damages finding is without support in the record. In answering Question 26, the jury determined what a "reasonable royalty" would have been had the parties negotiated for use of Bishop's trade secrets at the time the information was used. *See generally Univ. Computing v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974); *Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 737-38 (Tex. App.—Dallas 2010, no pet.) (following *University Computing*); Restatement (Third) of Unfair Competition § 45 cmts. d, g (discussing application and parameters of reasonable royalty damages).[22] The trial court specifically instructed the jury as follows:

> In determining a reasonable royalty, you should calculate what the parties would have agreed to as a fair price for licensing the confidential information. Your determination does not depend on the parties' actual willingness to engage in such negotiations. Your focus should be on what the parties' expectations would have been had they entered negotiations for royalties at the time the confidential information was used. In calculating what a fair licensing price would have been had the parties agreed, you should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; the prices past purchasers or licensees may have paid; the total value of the confidential information to Bishop, including the development costs and the importance of the confidential information to Bishop's business; the nature and extent of the use intended for the

---

[22] As the Restatement explains, there are several possible measures of damages in trade secrets cases, including: the plaintiff's lost profits, the defendant's gain, the defendant's savings resulting from using the trade secrets, and reasonable royalty. Restatement (Third) of Unfair Competition § 45 cmts. d-g. "Selection of the appropriate method of measuring monetary relief depends on the facts and circumstances of the particular case." *Id*. cmt. d; *see also Univ. Computing*, 504 F.2d at 535-37 (discussing different measures and specifically differentiating situations calling for "reasonable royalty" as opposed to "lost profits" calculations). The reasonable royalty measure has been employed in various situations, *id*. cmt. g; however, regardless of the propriety of its use in the present case, we must measure the sufficiency of the evidence on damages according to the charge submitted to the jury, which in this case presented the reasonable royalty measure and not lost profits or any other calculation. *Romero*, 166 S.W.3d at 221.

24

confidential information; and the availability of alternative sources for the information.[23]

The jury answered that a reasonable royalty would have been $1,696,428.55.[24]

The primary analysis of damages at trial came from Bishop's finance expert, James Woods, who, in addition to testifying, also provided an initial 17-page report and a 14-page supplemental report.[25] In the two reports, Woods details his analysis and findings, including his conclusion that Bishop's reasonable royalty damages for the misappropriation of his trade secrets amounted to at least $49 million. In his reports and testimony, Woods also detailed the sources for his information and the bases for his calculations. A large number of the sources he identified were also available for the jury to consider.[26]

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702. Expert testimony is admissible if the expert is qualified and the testimony is relevant and based on a reliable foundation. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d

---

[23] The concepts in the charge appear to have been derived from *University Computing*, 504 F.2d at 539.

[24] The jury found Reunion liable (jointly and severally with Miller) for 20% of this sum, or $339,285.71. Miller was held individually liable for the remainder.

[25] Reunion only references the first report in its briefing. At one point, Reunion suggests that Woods failed to consider the factors set forth in the seminal *University Computing* case. In his supplemental report, however, Woods specifically states that he analyzed those factors in making his determinations.

[26] Exhibit C to Woods's initial report represents that he reviewed well over a hundred documents, including many that were admitted into evidence in the case. These documents included, but were not limited to, various cost estimates and financial projections, government and other reports on potash and the potash market, negotiation and sales information, depositions, and mining plans.

797, 800 (Tex. 2006). Appellate courts generally review challenges to the admission of expert testimony under an abuse of discretion standard, but when a trial court admits expert testimony that is challenged on appeal as constituting "no evidence," we review the reliability of the expert testimony using a de novo standard of review. *Thomas v. Uzoka*, 290 S.W.3d 437, 447 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).[27]

Reunion begins by arguing that Woods's damages calculations were unreliable because he failed to provide separate values for each of the items the jury found to be Bishop's trade secrets and instead provided only one value for misappropriation. This argument, however, ignores the possibility that all of the discussed items were in fact part of Bishop's trade secret; the jury, after all, found Bishop owned a compilation trade secret comprised of some or all of the thirteen items listed in the jury charge. Moreover, Woods appears to have reasonably

---

[27] In this issue, Reunion principally challenges the reliability of Woods's testimony. Generally, challenges to the reliability of expert testimony must be preserved by proper and timely objection in the trial court. *See, e.g., RDG P'ship v. Long*, 350 S.W.3d 262, 268 (Tex. App.—San Antonio 2011, no pet.) ("When a reliability challenge requires the appellate court to evaluate the underlying methodology, technique, or foundational data used by an expert, an objection must be timely made in order to preserve a sufficiency complaint with regard to the expert's testimony."). It is difficult to tell on this record whether Reunion preserved these arguments. Reunion states in a footnote that it filed a motion to exclude Woods's testimony and that although the motion was not included in the clerk's record, Reunion has requested the clerk prepare a supplemental record containing the motion. No such record has been filed. *See generally Tex. First Nat'l Bank v. Ng*, 167 S.W.3d 842, 865-66 (Tex. App.—Houston [14th Dist.] 2005, judgm't vacated w.r.m.) (discussing supplementation of the record and refusing to consider supplemental record filed after opinion originally issued). In the reporter's record immediately prior to the beginning of Woods's testimony, there is a discussion regarding a motion in limine, but a motion in limine would not preserve arguments for the exclusion of the witness's testimony. *See, e.g., Perez v. Spring Branch I.S.D.*, No. 14-10-00058-CV, 2011 WL 742601, at *3 n.6 (Tex. App.—Houston [14th Dist.] March 3, 2011, pet. denied). During that discussion, there is a reference to an earlier "*Robinson* hearing" (possibly a hearing on the admissibility of Woods's testimony, *see E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995), and *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 576 (Tex. 2006)), but, again, no transcript from that hearing appears in the record. Nonetheless, for purposes of this appeal, we will assume without deciding that Reunion's arguments regarding Woods's testimony were preserved in the trial court.

concluded that within Bishop's trade secrets there exists a "tipping point" of sorts without which mining in the Ten Mile Area was not economically feasible. Under that analysis, it would be illogical to assign a value to each separate piece of the compilation.[28]

Next, Reunion asserts Woods failed to properly discount his figures due to the fact some of the information Bishop claimed to be part of his trade secret was indisputably in the public domain. Reunion further deems it "absurd" that Reunion would have paid money to be told what was in its own files. Again, the fact that some information Bishop used was in the public domain or contained within Reunion's files would not necessarily lessen the value of his trade secret: as discussed in prior sections of this opinion, evidence demonstrated that without Bishop's trade secret, there was little or no thought of economically mining potash in the Ten Mile Area; the jury could reasonably have deduced that Bishop's trade secret made such mining feasible where it was not feasible before. *See* Restatement (Third) of Unfair Competition § 39 cmt. f ("The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.").

Reunion further complains that Woods's analysis focused on a hypothetical negotiation between Bishop and Miller, instead of Bishop and Reunion, and did not take into account the fact Miller may have shared the information with others

---

[28] In other words, Reunion's arguments do not account for the possibility that the value of Bishop's plan may not fluctuate based on the number of individual items contained within the plan. If Bishop's plan was the key that made potash mining in the Ten Mile Area economically feasible, as the jury may have reasonably determined, it would not necessarily matter that the plan had three components or thirteen. The jury could have determined the plan had the same value regardless of how many component parts were involved or were trade secrets on their own.

Without explanation, Reunion also complains that Woods failed to assign a value to the compilation as a whole. On the surface, this appears to be the opposite of their complaint that he failed to disaggregate items from the compilation.

or that different negotiations could have occurred at different times. These arguments ignore the considerable evidence indicating Miller served as an agent for Reunion from the time he became its president through the time he worked with outside consultants to develop the Operating Plan for submission to the BLM. It therefore was not necessarily improper to consider Miller as one half of the negotiating pair. Furthermore, the core of the negotiation analysis is what a willing buyer would be willing to pay a willing seller for a license to use the trade secret at issue. *See* Restatement (Third) of Unfair Competition § 45 cmt g. Reunion does not suggest how using Miller's name as the hypothetical "willing buyer" changed Woods's calculations in any way. Reunion further points to no evidence that the value of the trade secrets was in any way affected by any prior disclosure, such as that to BHP, or that Woods failed to appreciate this possibility. *See generally In re Waste Mgmt. of Tex., Inc.*, 392 S.W.3d 861, 870 (Tex. App.—Texarkana 2013, no pet.) (explaining that while absolute secrecy is not required for trade secret protection to apply, the owner must take reasonable precautions to ensure the secrecy of the information); Restatement (Third) of Unfair Competition § 39 cmt. f (discussing the level of secrecy required and stating, "[C]onfidential disclosures . . . will not destroy the information's status as a trade secret. Even limited non-confidential disclosure will not necessarily terminate protection if the recipients . . . maintain the secrecy of the information."). Reunion was certainly free to question Woods regarding this at trial or to put on its own evidence or expert.[29]

Lastly, Reunion posits that Woods's methodology was unreliable because he utilized Miller's financial projections and assumed that adequate financing for the project could be arranged. In support, Reunion points to earlier attempts to market

---

[29] Reunion, in fact, presented its own valuation expert, Karl Schwabauer, who provided a critical assessment of Woods's calculations as well as of the reliability of the underlying financial projections.

28

the plan that were unsuccessful, such as the overtures to BHP and Bishop and Miller's initially unsuccessful attempts to find investors. Reunion further asserts Woods failed to adequately account for inherent risks involved in a project of this magnitude, citing *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 184-85 (Tex. 2001) (finding expert testimony on fair market value incompetent when it "fail[ed] to account for basic marketplace realities," including "unexpected competition," "economic stagnation," and "other risks.").[30]

As Woods stated in his trial testimony, "the main purpose of [his] supplemental report" was to address the reliability of the underlying financial calculations, including specific elements regarding Miller's background, events relating to the case, and events arising subsequent to the misappropriation of Bishop's trade secrets that Woods determined made the financial projections reasonable and reliable. Reunion does not mention Woods's supplemental report in its briefing nor discuss the substance contained therein.[31] Although BHP ultimately declined to participate in developing the project, it is not clear on this record exactly why BHP made this decision. It may have had little to do with the viability of the project. Ultimately, Miller convinced Reunion to invest and Bishop did the same with Pinnacle. Reunion President Gordon Gray also testified

---

[30] Woods stated in his report, "[a]s the use of the trade secrets was going to allow for mining and sales of potash from a location that had not previously been able to profitably produce potash, the value of the trade secret is the entirety of the value expected to be derived from the Project." Reunion contends that this language suggests Woods did not sufficiently contemplate the risks.

[31] Reunion asserts that "[b]ecause [Woods] relied on speculative pro forma projections of profits . . . and [Bishop] did not present evidence of any of the *University Computing* factors . . . the jury was left without any evidentiary basis for assessing damages." However, as stated, the point of Woods's second report was to address the propriety of using the financial projections that he did. Woods also expressly stated in the second report that the *University Computing* factors guided his analysis. Reunion does not mention, much less analyze or critique, the supplemental report, and the supplemental report renders Reunion's challenges to the original report moot.

optimistically regarding obtaining further funding. We do not find any merit in Reunion's legal sufficiency arguments regarding Woods's expert testimony and reports or, consequently, the sufficiency of the evidence on damages.[32] Finding no merit in any of Reunion's appellate complaints, we overrule its sole issue.

## III. Bishop & Pinnacle's Appeal

Bishop raises two contentions in his appeal, asserting the trial court erred in submitting (or failing to disregard) Question 22 on proportionate responsibility for

[32] Reunion does not make any specific arguments based on the fact that while Woods concluded reasonable royalty damages were $49 million, the jury only awarded $1,696,428.55 for such damages. Reunion's argument is essentially that because Woods's testimony and reports were unreliable, there was no evidence to support an award of any reasonable royalty damages. In other words, Reunion expressly seeks a reversal and render, not reversal and remand. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 877-78 (Tex. 2010) (remanding case when plaintiff proved entitlement to lost profit damages but trial court awarded more than the evidence supported); *Garza v. Cantu*, No. 14-11-00724-CV, 2013 WL 2631573, at *5, 7, 9 (Tex. App.—Houston [14th Dist.] June 11, 2013, no pet. h.) (reversing and remanding for new trial when evidence demonstrated some damages were incurred but not the full amount awarded by the jury).

Moreover, given the nature of calculating a reasonable royalty based on a hypothetical negotiation, juries in reasonable royalty cases are entitled to a certain amount of flexibility in making their determination. *See, e.g., Unisplay, S.A. v. Amer. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995) (stating reasonable royalty calculation is a question of fact that "necessarily involves an element of approximation and uncertainty"); *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991) (explaining that factfinder was not restricted to the specific figures proffered by the parties).

Here, the jury had input from competing expert witnesses to guide its analysis; the jury may reasonably have believed some of Woods's testimony regarding value but also may have agreed with some of Schwabauer's critique. *See, e.g., CBS Outdoor, Inc. v. Potter*, No. 01-11-00650-CV, 2013 WL 269091, at *13 (Tex. App.—Houston [1st Dist.] Jan. 24, 2013, pet. denied) (upholding jury's damages award based on lost profits when award was below the amount plaintiff's expert testified to and opposing experts offered critiques of plaintiff's experts calculations and not their own calculations); *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 50-51 (Tex. App.—San Antonio 2006, no pet.) (explaining that jury was entitled to weigh competing expert testimony regarding lost royalty damages and could reasonably have reduced plaintiff's expert's projections based on challenges made by defendant's expert). As one example, Schwabauer strongly criticized Woods for using a 10 percent discount rate in determining the present value of future potential profits; Schwabauer argued that a rate of 50-80 percent would be more reasonable. He further criticized Woods for not properly accounting for the payment of taxes in his calculations, among other things.

30

misappropriation because it was (1) not supported by evidence and therefore immaterial and (2) not predicated on a finding of independent conduct by Miller. Question 22 was predicated on an affirmative finding for misappropriation by both Miller and Reunion in response to Question 21. Question 22 further instructed the jury, "For each person you found caused or contributed to cause the harm, find the percentage of responsibility attributable to each[.]" The jury found Miller 80% responsible and Reunion 20% responsible.

## A. Evidence Supporting Proportionate Responsibility Question

Bishop first argues, in two issues, that Question 22 was immaterial because (1) the evidence established that this was a case of "pure" vicarious liability because there is no evidence Reunion acted in any way to misappropriate Bishop's secrets except through Miller's conduct, and (2) there is no evidence that Miller misappropriated trade secrets outside of his relationship with Reunion. Bishop therefore asserts that the trial court should not have submitted the proportionate responsibility issue to the jury. *See* Tex. Civ. Prac. & Rem. Code § 33.003(a) (governing proportionate responsibility determinations), (b) ("This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission."); *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 657 (Tex. App.—Dallas 2002, pet. denied) ("[W]hile the statute on its face requires all defendants to be included in the apportionment question, it would not be proper for an employer to be included along with the driver if its only responsibility was that of respondent superior."). Alternatively, Bishop contends the trial court should have disregarded the jury's findings on the issue. *See Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) ("A trial court may disregard a jury finding only if it is unsupported by evidence . . . or if the issue is immaterial."). We apply the usual standards of review governing

no evidence contentions. *See City of Keller*, 168 S.W.3d at 822, 827.[33]

Bishop first asserts that Reunion successfully sought directed verdict on Bishop's other tort claims against it by explaining that all of the conduct alleged against Reunion was actually performed by Miller. However, even assuming Reunion can only be held liable based on Miller's actions on its behalf, this does not necessarily mean the proportionate responsibility submission was in error. There was at least some evidence in the record that Miller also misappropriated Bishop's trade secrets outside his capacity as an agent or vice principal of Reunion, meaning there is evidence to support the trial court's decisions to submit the proportionate responsibility question and for the jury to apportion responsibility between Miller and Reunion.

It is undisputed that before he became president of Reunion, Miller used at least some of Bishop's information in presentations to other shareholders of Carnallite (which subsequently bought Reunion) as well as to BHP and others, to try to obtain their investment in the project, and to Texas Community Bank in order to obtain funding to purchase Reunion. Bishop maintains that the information in these earlier presentations, sometimes entitled "Executive Summary," was not specific enough to have misappropriated his trade secrets. According to Bishop, it was only in later PowerPoint presentations, which Miller developed after Carnallite purchased Reunion, and in the Operating Plan submitted to the BLM that Miller actually used enough of Bishop's plan to constitute misappropriation.

---

[33] In his closing argument at trial, Bishop's attorney urged the jury to find that Reunion was 80 percent responsible for Bishop's damages and Miller was only 20 percent responsible. In doing so, he explained that Bishop was at times "wearing the hat of Carnallite," but that ultimately, Reunion had the information and the asset going forward.

32

The executive summaries, however, provided significant detail regarding Bishop's plan for mining potash, touting the novelty of the process and explaining it was a selective solution mining technique borrowed from the natural gas industry that utilized a counter-flow, recycling heat exchanger and crystallizer and provided environmental benefits such as using less water and a smaller "footprint" than those typically allowed by the BLM. Other communication Miller engaged in, with BHP representatives, among others, prior to his association with Reunion also provided details regarding Bishop's plan and hinted that additional details had been otherwise shared. As discussed in detail above, even once Carnallite purchased Reunion and Miller became Reunion's president, there was evidence Miller continued to act on behalf of Carnallite and in his own interests as well.[34] For example, the Carnallite Business Plan, which Miller admitted was essentially taken wholly from Bishop's plan, discusses how to develop and capitalize upon the mining process Bishop developed. While this plan might not by itself constitute a commercial use of Bishop's trade secrets, it supports the conclusion that Miller was not operating solely on behalf of Reunion when he used Bishop's information.

Furthermore, in his communication with BHP, Miller identified himself as working for Carnallite, and one of his proposals was for BHP to buy Carnallite itself and not just Reunion. Altogether, this evidence supports the trial court's decision to submit the proportionate responsibility issue to the jury. Consequently, we overrule Bishop's first two issues.

---

[34] "When the same individuals serve multiple entities as their officers, directors, or employees, it may become necessary to determine the entity to which an individual's conduct should be attributed." Restatement (Third) of Agency § 7.03 cmt. d(3). In its own appeal, Reunion argues that all of Miller's conduct was either on his own behalf or on behalf of Carnallite and that none of it benefitted or can be ascribed to Reunion.

## B. Not Predicated on Independent Conduct

In his third issue, Bishop complains that Question 22 on proportionate responsibility should have been predicated on a finding of conduct by Miller independent of his conduct on behalf of Reunion. More specifically, Bishop contends the trial court should have disregarded the jury's answer to Question 22 because Reunion failed to obtain a necessary predicate finding regarding Miller's conduct.

We begin by noting that Bishop did not object to the charge on the grounds that it omitted a question on independent conduct or that the proportionate responsibility question was not predicated on such a finding. Bishop objected to Question 22 only on the ground that it should not have been submitted because Reunion's potential liability was only derivative of Miller's liability as an individual.[35] Bishop suggests that this objection was sufficient to put Reunion and the court on notice that a separate question on independent conduct was required. Texas Rule of Civil Procedure 274, however, requires that "[a] party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." Tex. R. Civ. P. 274; *see also Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 404 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd by agreement) ("An objection does not meet requirements of Rule 274 unless the defect relied upon by the objecting party and the grounds of the objection are stated specifically enough to support the conclusion that trial

---

[35] We rejected this argument above in discussing Bishop's first two issues. Basically, even assuming all of Reunion's liability is based on Miller's conduct, the proportionate responsibility question was still properly submitted because there was evidence that Miller misappropriated trade secrets outside of his agency for Reunion.

34

court was fully cognizant of the ground of complaint and deliberately chose to overrule it."). Bishop's objection neither mentioned the specific problem he complains about on appeal (failure to condition the proportionate responsibility question on an additional question regarding Miller's independent conduct) nor urged the solution he now claims was required (submission of a separate question regarding Miller's conduct). *See* Tex. R. App. P. 33.1(a) (providing that as a prerequisite to presenting a complaint for appellate review, the complaint must be made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint).

Furthermore, Bishop does not offer any authority that supports his position or offer an explanation as to why the charge as given was not sufficient under the circumstances of this case. *See id.* 38.1(i) (requiring appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").[36] The jury was specifically instructed, in Question 21 on misappropriation, that Reunion would be responsible for Miller's conduct only to the extent that conduct was committed within the scope of his employment or his actual authority as an agent. The fact that the jury found both parties misappropriated trade secrets but Reunion was only 20% responsible strongly suggests that the jury found at least some of Miller's conduct was not within the scope of his employment or agency. As discussed above, the evidence supports

---

[36] Bishop cites Texas Rule of Civil Procedure 279 (relating to omitted elements of claims or defenses) and *DiGiuseppe v. Lawler*, 69 S.W.3d 588, 598 (Tex. 2008) (discussing rule 279 and deemed elements), but neither of these authorities suggests that Question 22 on proportionate responsibility should have been predicated on a finding of independent conduct by Miller. Bishop further cites *Powell Industries, Inc. v. Allen*, 985 S.W.2d 455, 457 (Tex. 1998), for the proposition that a plaintiff must obtain an additional finding in order to prove tortious interference, which Bishop analogizes to the circumstances at hand, but *Powell* was a summary judgment case which says nothing about what should be in a jury charge.

35

this finding.  Bishop has not established that the trial court erred in submitting the charge.  Accordingly, we overrule Bishop's third issue.

## IV.  Conclusion

Having overruled all of the issues raised in these consolidated cross-appeals, we affirm the trial court's judgment.

/s/    Martha Hill Jamison
       Justice

Panel consists of Justices Christopher, Jamison, and McCally (Christopher, J., concurring).