**Opinion issued June 3, 2014**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NO. 01-11-00746-CV

_____

**HOUSTOUN, WOODARD, EASON, GENTLE, TOMFORDE AND ANDERSON, INC. D/B/A INSURANCE ALLIANCE, Appellant**

**V.**

**ESCALANTE'S COMIDA FINA, INC., Appellee**

---

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-52295**

---

## MEMORANDUM OPINION ON REHEARING[1]

---

[1] We originally issued our opinion in this appeal on August 29, 2013, and appellee Escalante's Comida Fina, Inc. filed a timely request for en banc reconsideration. We withdraw our previous opinion, vacate our judgment, and issue this opinion and related judgment in their stead. The motion for en banc reconsideration is

Escalante's Comida Fina, Inc. sued its former insurance agent, Houstoun, Woodard, Eason, Gentle, Tomforde and Anderson, Inc., d/b/a Insurance Alliance for breach of contract and violations of the Deceptive Trade Practices Act[2] and the Texas Insurance Code. The breach of contract claim was based on the failure to procure an insurance policy with coverages requested by Escalante's, and the DTPA and Insurance Code claims were for misrepresentations and non-disclosure of information about the policy and the coverage afforded thereunder. The jury returned a verdict in favor of Escalante's, and the trial court signed a final judgment awarding $56,835 in actual damages, $75,780 in additional damages for Insurance Alliance's "knowing" violation of the DTPA and the Insurance Code, attorney's fees, costs, and pre- and post-judgment interest.

Insurance Alliance raises the following ten points of error:

1. The trial court erred in submitting jury questions 3A, 3B, 4A, and 5B regarding DTPA and Insurance Code violations, and breach of contract because there was legally insufficient evidence of causation to support the jury submissions;

2. The trial court erred in submitting jury questions 3A and 4A regarding DTPA and Insurance Code violations because there was legally insufficient evidence that Insurance Alliance made any misrepresentation of fact;

3. The trial court erred in submitting jury question 3B regarding failure to disclose because there was legally insufficient evidence

---

dismissed as moot. *See Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 40 & n.2 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

[2] TEX. BUS. & COM. CODE ANN. §§ 17.001–.926 (West 2011 & Supp. 2012).

to support the submission and because there was a disclosure as a matter of law;

4. The trial court erred in refusing to instruct the jury on questions 3A, 3B, 4A, and 7B as to longstanding Texas law about an insurance agent's duties;

5. The trial court erred in submitting a breach of contract question to the jury because there was legally insufficient evidence that the parties entered a valid and binding agreement or that Insurance Alliance breached an alleged agreement to procure coverage that compared "apples to apples" vis-a-vis Escalante's prior coverage;

6. The trial court erred in submitting a breach of contract question because a cause of action for failure to perform a professional service is a tort rather than a breach of contract;

7. The trial court erred in entering final judgment because the uncontroverted evidence was that the off-premises failure of power to the restaurants resulted from the direct physical loss or damage to overhead power lines—excluded from coverage on Escalante's "Ike claim" for business interruption—and thus the jury's finding was against the great weight of the evidence;

8. The trial court erred in entering final judgment because the evidence to support the damage award was legally and factually insufficient because there was no evidence of what the policy procured by Insurance Alliance would have paid had it been identical to the prior policy;

9. The trial court erred in submitting a question on knowing conduct because there was legally and factually insufficient evidence that Insurance Alliance knowingly provided a policy that was not comparable to the prior policy; and

10. The trial court erred in allowing expert testimony about attorney's fees despite Escalante's failure to properly designate an expert and to provide documents relied upon by the expert to Insurance Alliance.

We reverse and render judgment in favor of Insurance Alliance.

3

## Background

Between 2003 and 2008, Escalante's owned and operated four restaurants in the Houston area. Between 2003 and 2006, the property and casualty insurance policy on the restaurants was with Ohio Casualty Group.[3] The Ohio Casualty Policy provided, subject to certain exceptions, coverage against the loss of business income caused by an off-premises power or utilities outage. In 2005, Hurricane Rita struck Houston. Escalante's subsequently made a claim against the policy and Ohio Casualty paid the claim.

The Ohio Casualty Policy recited (Section III, n.):

> The following items are added to the Additional Coverages section of Part A coverage of the Property Coverage form:
>
> n. Off Premises Power Failure
>
> We will pay up to $25,000 for loss of Business Income and Extra Expenses caused by the failure of power or other utility service supplied to the described premises if the failure occurs away from the described premises.
>
> The failure of power or other utility service must result from direct physical loss or damage by the Covered Cause of Loss.
>
> We will only pay for the loss you sustain after the first 24 hours following the direct physical loss to the off premises property. Off Premises Power Failure under this Additional Coverage does not apply to failure of power or other utility service resulting from direct physical loss or damage by any Covered Cause of Loss to overhead transmission lines.

---

[3] The Ohio Casualty Policy was acquired for Escalante's by its insurance agent, Mace Meeks. Insurance Alliance had been Escalante's insurance agent prior to 2003.

Patrick Torres, the president of Escalante's, testified that during this same time period, Insurance Alliance's principal, Kirk Gentle, was seeking to regain Escalante's as a client. Toward this end, Escalante's provided Insurance Alliance with a copy of its then-current policy and agreed to purchase coverage under a new policy procured by Insurance Alliance if the coverage matched the Ohio Casualty coverage but cost less. According to Torres, Insurance Alliance told him that it had such a policy. Torres specifically reminded Insurance Alliance of his prior claim from Hurricane Rita and emphasized that the coverage he sought from Insurance Alliance had to be the same as that provided by the Ohio Casualty Policy. In fact, Torres asked if the coverage under the new policy matched the Ohio Casualty Policy "apples to apples," and was assured that it did.

In reliance upon Insurance Alliance's assurances, Escalante's declined to renew the Ohio Casualty Policy and, instead, purchased a new insurance policy issued by Allied Property & Casualty Insurance Company from Insurance Alliance in 2006. No claims were made on the Allied Policy during the first year, and the policy was renewed for 2007–2008.

In September 2008, Hurricane Ike caused a temporary loss of electrical power at all four Escalante's restaurants, and Escalante's lost revenue as a result of the interruption. Apart from minor damage suffered at one location, none of the other restaurant locations suffered physical damage, but all experienced food

5

spoilage and business interruption. Escalante's complained that it never recovered for these losses under the Allied Policy because losses caused by an off-premises power failure were expressly excluded from coverage.

Exclusion (e) to Section B of the Allied Policy stated:

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other causes or event that contributes concurrently or in any sequence to the loss.

. . .

e. Off-Premise Services

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

But if a failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Escalante's maintained that had the Allied Policy's coverage been identical to the prior Ohio Casualty Policy, as Insurance Alliance had assured, the restaurants' losses would have been covered. Escalante's sued Insurance Alliance for its failure to procure coverage that matched the prior Ohio Casualty Policy "apples to apples."

The jury found that: (1) the off-premises power failure did not result from direct physical loss or damage to "overhead transmission lines"; Insurance Alliance (2) failed to render the professional service of advice, judgment, opinion

6

or similar professional skill; (3A) engaged in false, misleading or deceptive acts or practices upon which Escalante's relied to its detriment and which were a producing cause of damages; (3B) failed to disclose information about goods or services that was known at the time of the transaction with the intention to induce Escalante's into a transaction it otherwise would not have entered into if the information had been disclosed; (3C) engaged in the conduct knowingly; (4A) engaged in an unfair or deceptive act that caused damages to Escalante's; (5A) Escalante's and Insurance Alliance agreed that Insurance Alliance would obtain insurance coverage for Escalante's comparable to the insurance coverage provided under the Ohio Casualty Policy; (5B) Insurance Alliance failed to comply with the agreement; (6A) the reasonable damages to compensate Escalante's were $18,945 for each of Escalante's four locations; (6B) $75,780 additional damages for knowing conduct should be awarded to Escalante's; and (7) Escalante's was also negligent and 25% responsible for its own damages.

**Sufficiency of Evidence Regarding Cause of Off-Premises Power Outage**

In its seventh point of error, Insurance Alliance contends that establishment of causation with respect to the DTPA, Insurance Code, and breach of contract claims brought by Escalante's requires sufficient evidence that the business-interruption losses suffered by Escalante's—which were not covered by the Allied Policy—would have been covered by the prior Ohio Casualty Policy.

7

Because the Ohio Casualty Policy expressly excluded coverage for off-premises power failures resulting from direct physical loss or damage to "overhead transmission lines," Insurance Alliance argues that there must be sufficient evidence establishing the inapplicability of the exclusion. And as the only evidence of the cause of the power outage suffered by Escalante's established the applicability of that exclusion, Insurance Alliance argues that the jury's contrary finding was also against the great weight of the evidence. We construe this argument as a challenge to both the legal and factual sufficiency of the evidence in support of the jury's finding that the off-premises power failure to Escalante's restaurants did *not* result from the excluded cause.

### a. Standard of Review

A party who attacks the legal sufficiency of an adverse finding on an issue on which that party has the burden of proof must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). When an appellant attacks the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983).

Our review of legal sufficiency credits favorable evidence if a reasonable juror could do so and disregards contrary evidence unless a reasonable juror could

8

not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. We sustain a no-evidence contention only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

Our review of a challenge to the factual sufficiency of the evidence must consider and weigh all evidence, and we set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). Likewise, when a party challenges the factual sufficiency of the evidence supporting an adverse finding on which the opposing party had the burden of proof, we should set aside the finding only if the evidence supporting it is so weak as to be clearly wrong and manifestly unjust. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 312 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Cain*, 709 S.W.2d at 176)).

Whether reviewing the evidence for legal or factual sufficiency, we are mindful that the jury is the sole judge of a witness's credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819. Of course, "[t]he jury's decisions regarding credibility must be reasonable." *Id.* at 820. "Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.* "[W]henever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review." *Id.*; *see also Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 338 (Tex. 1998) ("[T]he judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry.")

We measure the sufficiency of the evidence according to the charge submitted to the jury. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex.

2005); *Bishop v. Miller*, 412 S.W.3d 758, 767 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

### b. Discussion and Analysis

The parties agree that to establish causation for its DTPA, Insurance Code, and breach of contract claims, Escalante's had the burden to show that its business interruption losses from Hurricane Ike—not covered by its Allied Policy—would have been covered by its Ohio Casualty Policy. *See Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830, 835–36 (Tex. 2009) (per curiam) (stating that in order to prove causation in failure-to-procure-coverage case, plaintiff must show that coverage for his claims could have been obtained because "the injury would have been the same regardless"). The parties disagree, however, about which party had the burden as to the applicability of the Ohio Casualty Policy's exclusion of coverage for power losses caused by damage to overhead transmission lines. Nevertheless, it is unnecessary for the Court to reach that issue because the evidence at trial conclusively established the applicability of the policy exclusion (i.e., that the off-premises power failure was caused by damage to overhead transmission lines), and no evidence was admitted in support of the jury's contrary finding. *See Dow Chem. Co.*, 46 S.W.3d at 241 (party attacking legal sufficiency of adverse finding on issue on which that party has burden of proof must demonstrate that the evidence establishes, as matter of law, all vital facts in support

11

of issue); *Croucher*, 660 S.W.2d at 58 (party attacking legal sufficiency of adverse finding on issue for which it did not have burden of proof must demonstrate that there is no evidence to support adverse finding).

Here, the jury was asked whether the off-premises power failure experienced by Escalante's was the result of "direct physical loss or damage to overheard transmission lines." The jury answered "no" as to all four restaurants. The jury was also instructed that "[w]hen words are used in this charge in a sense which varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning." In other words, the jury was instructed to give the words used in the charge their commonly understood meaning unless a definition was provided. No definition—technical, legal, or otherwise—of "overhead transmission lines" was provided to the jury in the jury charge, and no objection was lodged as to the lack of such definition at the charge conference. Accordingly, we measure the sufficiency of the evidence supporting the jury's finding that the off-premises power failure was not due to direct physical loss or damage to "overhead transmission lines" against the commonly understood meaning of the phrase "overhead transmission lines." *See Kroger Co. v. Brown*, 267 S.W.3d 320, 322–23 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (measuring sufficiency of evidence against commonly understood meaning of term not defined in charge); *see also Romero*, 166 S.W.3d at 220–21

(stating sufficiency of evidence must be measured by jury charge when there has been no objection to it); *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 868–69 (Tex. App.—Dallas 2008, no pet.) (reviewing sufficiency of evidence based on common meaning of undefined term when no objection to charge was asserted at trial); *Hirschfield Steel Co. v. Kellogg Brown & Root, Inc.*, 201 S.W.3d 272, 283–86 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (same).

An overhead transmission line is commonly understood to mean any overhead line carrying an electric utility's current (i.e., what is referred to in common parlance as an overhead power line). *See Traxler v. Entergy Gulf States, Inc.*, 376 S.W.3d 742, 747–48 (Tex. 2012) (concluding that terms "transmission line" and "distribution line," as used in prior version of Texas Utilities Code, are interchangeable and that both terms refer to any line carrying electric utility's current).[4] In particular, the Texas Supreme Court noted:

> The words "distribution" and "transmission" are common words that are used frequently in everyday conversation and writing, and can mean the same thing in common parlance. For example, a well-known dictionary defines "distribute" to mean "to deal out," "to spread or scatter," or "to place at different points," while it similarly defines "transmit" to mean "to send or pass on from one person or place or thing to another." Black's Law Dictionary provides that "distribute" can simply mean "[t]o apportion" or "[t]o deliver," while

---

[4]   The Legislature later amended the Utilities Code by adding definitions of the terms "transmission line" and "distribution line." *See* TEX. UTIL. CODE ANN. § 181.041(3), (4) (West 2013) (defining "distribution" line as power line operated below 60,000 volts and "transmission" line as power line operated at 60,000 volts or more). These amendments went into effect on May 18, 2013.

> "transmit" can mean [] "[t]o send or transfer (a thing) from one person or place to another."

*Id.* at 747 (citations omitted).

The only evidence admitted as to the source of the off-premises power outage came from the deposition testimony of CenterPoint's designated corporate representative and senior service consultant, Scott Humble, and the CenterPoint business records upon which he relied. Employed by CenterPoint and/or its predecessor company for more than twenty-eight years, Humble dealt with the circuits and CenterPoint's power distribution system on a daily basis and testified regarding the cause of the off-premises power outage experienced by Escalante's during Hurricane Ike.

Both at trial and on appeal, Escalante's argued that Humble's opinion testimony that the power loss stemmed from damage to the overhead transmission lines conflicted with other material portions of his testimony, and was unsupported by the business records upon which he relied.[5] According to Escalante's, it was the jury's province to reconcile the conflicts and inconsistencies between

---

[5] Escalante's also contends that Humble's testimony was not based upon his first-hand knowledge. The record does not demonstrate that Escalante's ever objected to Humble's testimony on this or any other basis. *See* TEX. R. APP. P. 33.1 (stating that to preserve argument for appellate review, party must present it to trial court by timely request, motion, or objection, state sufficiently specific grounds therefore, and obtain ruling).

14

Humble's "opinion" testimony, the remainder of his testimony referenced above, and CenterPoint's records. *See City of Keller*, 168 S.W.3d at 819.

Humble's testimony, however, was neither internally inconsistent nor contradictory. He established early on in his testimony three possible reasons for the power disruption: (1) a problem with or damage to the substation that services a given property, (2) damage to the underground portion of the distribution system between the substation and property, or (3) damage to the above-ground portion of the distribution system between the substation and property. After reviewing CenterPoint's records and documentation regarding the power loss, Humble specifically excluded the first two possible causes—i.e., damage to or problems associated with the substation and damage to the underground distribution system—and deductively concluded that the power loss could only have been caused by damage to the above-ground portion of the distribution system between the substation and the property.

Humble's testimony noted that the records referenced numerous problems or damage to the above-ground portion of the distribution circuit, and he could not be sure *which particular instance* was responsible for the power outage Escalante's experienced. Nor did he know the *exact location* along the overhead lines where the problem occurred, but his testimony was, nevertheless, clear and

unequivocal—the off-premises power failure was caused by damage to the overhead power lines. In particular, Humble testified:

> Q. With regard to all four locations that we've talked about, the Escalante's restaurant, to wrap up, based on all the information that's available to you and your 28 years with the company working with distribution—power distribution, is there any reasonable explanation for the power going off at any of those four restaurants other than some damage or combination of damage in the overhead portion of the distribution system?
>
> . . .
>
> A. I cannot pinpoint any locations (sic) that happened, occurred on any of these locations. It appears that Hurricane Ike knocked out electricity to all four locations.
>
> Q. By damaging what?
>
> A. By damaging the overhead power lines.
>
> Q. Is that speculation?
>
> A. No.

Although it could have sought to admit its own expert testimony, Escalante's introduced no evidence to contradict Humble's testimony on this point. Consequently, the only evidence before the jury was Humble's testimony based upon his specialized knowledge of electric power distribution systems, generally, and CenterPoint's Houston–area system in particular. The jury, then, was not free to disbelieve such unambiguous and uncontradicted testimony from a skilled witness. *City of Keller*, 168 S.W.3d at 820 ("Jurors cannot ignore undisputed

16

testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted."); *Uniroyal Goodrich Tire*, 977 S.W.2d at 338 (stating uncontradicted opinions of experts and skilled witnesses are conclusive and binding upon fact-finder if subject of testimony is one for experts or skilled witnesses alone).

In its request for en banc reconsideration, Escalante's argues for the first time that there is a critical distinction between transmission lines and distribution lines,[6] and that the use of the terms "transmission," "distribution," and overhead "power" lines interchangeably during Humble's deposition rendered the testimony ambiguous. Escalante's argues that in light of Humble's acknowledgement that there is a difference between transmission and distribution lines[7] Humble's testimony that the loss was caused by damage to overhead "power" lines could have referred to either overhead "distribution" or overhead "transmission" lines.

---

[6] Escalante's never argued this distinction to the jury. In opening statement it refers extensively to "power lines," but never "transmission lines," and, too, in closing argument: "I submit to you, ladies and gentlemen, [the cause of the power loss] was not the overhead ***power*** lines."

Escalante's cites to section 181.041 of the Utilities Code, which added definitions of the terms "transmission line" and "distribution line" in May 2013— approximately two years after the jury reached its verdict in the present case. *See* Tex. Util. Code Ann. § 181.041(3), (4) (defining "distribution" line as power line operated below 60,000 volts and "transmission" line as power line operated at 60,000 volts or more).

[7] When asked a question about "overhead transmission lines" during his deposition, Humble responded, "We have transmission lines. We have dis[tribu]tion lines and we have underground lines. And this [document] is dealing with distribution lines. It has nothing to do with transmission lines."

Thus, it concludes, when Humble testified that the loss was caused by damage to overhead "power" lines, the jury must have inferred that he meant the power loss was caused by damage to overhead "distribution" lines, rather than "transmission" lines, and under *City of Keller*, we must defer to the jury's resolution of this issue.

Escalante's, however, did not point out this distinction between the terms "distribution" and "transmission" to the jury, nor argue to the jury that Humble's testimony regarding overhead "power" lines must refer to distribution lines, not transmission lines. Moreover, the jury's charge did not include a definition of "overhead transmission lines," and there was no objection to its absence at the charge conference. *See Romero*, 166 S.W.3d at 220–21 (stating sufficiency of evidence must be measured by jury charge when there has been no objection to it). Accordingly, we must measure the sufficiency of the evidence based on the commonly understood meaning of the term "overhead transmission lines" (i.e., an overhead line carrying an electric utility's current)—not on the more technical definition of the term that Escalante's urges us to adopt in its request for en banc reconsideration. *See Kroger Co.*, 267 S.W.3d at 322–23 (measuring sufficiency of evidence against commonly understood meaning of term not defined in charge); *see also EMC Mortg. Corp.*, 252 S.W.3d at 868–69 (reviewing sufficiency of evidence based on common meaning of undefined term when no objection to charge was asserted at trial); *Hirschfield Steel Co.*, 201 S.W.3d at 283–86 (same).

18

Measured against the language of the jury charge and the commonly understood meaning of "overhead transmission lines," (i.e., overhead power lines), *see Traxler*, 376 S.W.3d at 747–48, we conclude that the evidence at trial conclusively established that the off-premises power failure experienced by Escalante's did result from direct physical loss or damage to overhead power lines. Accordingly, the jury's finding otherwise (i.e., that the Ohio Casualty Policy's exclusion did not apply), was not supported by legally sufficient evidence.

We sustain Insurance Alliance's seventh point of error on legal sufficiency grounds.[8]

## Conclusion

We reverse the judgment of the trial court and render judgment in favor of Insurance Alliance.

Jim Sharp
Justice

Panel consists of Justices Keyes, Sharp, and Brown.

---

[8] Because of our disposition of this issue, we need not address any of Insurance Alliance's remaining issues.