**ELECTRO–MINIATURES CORPORA-TION, Plaintiff-Appellee,**

v.

**WENDON COMPANY, INC., and Fred Eccles, Defendants,**

**Wendon Company, Defendant-Appellant.**

**No. 1199, Docket 85–7164.**

United States Court of Appeals, Second Circuit.

Argued May 15, 1985.

Decided Aug. 20, 1985.

Steven L. Levitt, Williston Park, N.Y. (Schulman & Levitt, P.C., Williston Park, N.Y., of counsel), for plaintiff-appellee.

Dion W. Moore, Bridgeport, Conn. (Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., of counsel), for defendant-appellant.

Before LUMBARD, OAKES and CARDAMONE, Circuit Judges.

LUMBARD, Circuit Judge:

Wendon Company appeals from a July 20, 1984 judgment of the District of Connecticut, following a jury verdict, holding it liable in the amount of $375,000 for wrongfully acquiring the trade secrets of Electro-Miniatures Corporation (hereinafter "EMC") and from Judge Eginton's refusal to order a directed verdict, a judgment n.o.v., a new trial or, alternatively, to resubmit special interrogatories to the jury. Wendon contends that insufficient evidence supports the jury's conclusions: 1) that EMC possessed a trade secret; 2) that Wendon wrongfully acquired that trade secret; and 3) that Wendon's wrongful acquisition injured EMC in the amount of $375,000. In addition, Wendon argues that the jury's findings are inconsistent, that Judge Eginton wrongfully admitted certain evidence of damages, and that certain of his statements made during trial prejudiced the defendant. Because we see no error in the jury's findings or in the judge's rulings or conduct, we affirm.

EMC and Wendon manufacture slip ring assemblies which are electro-mechanical devices that allow electricity to pass from fixed objects to rotating structures. They are used, primarily by the military, in such things as submarine periscopes, tank turrets, and rotating antennas. There are two basic designs for slip ring assemblies. One involves the bonding of a stamped silver ring to an insulating board. The other, a more advanced design, replaces the stamped silver ring with printed circuitry which, in turn, requires additional modifications. Demand for the latter type of slip ring—known as a printed circuit slip ring—increased in the mid–1970's because it requires less silver.

In 1969, EMC purchased the slip ring business of Breeze, Inc., including its product line, machinery, catalogs, customer lists and more than 1,000 of its detailed drawings. EMC's purchase enabled it for the first time to produce printed circuit slip ring assemblies. EMC paid Breeze in excess of $250,000 for the acquisition.

At the time of EMC's acquisition, Fred Eccles was an engineer and salesman in Breeze's slip ring division. In 1970, Eccles transferred to EMC, where he continued to work in sales, and in February 1974 he left EMC to become sales manager at Wendon. Subsequent to his arrival, Wendon began producing and selling large quantities of printed circuit slip ring assemblies.

On April 24, 1978, EMC filed this diversity suit alleging, among other things, that Wendon and Fred Eccles had misappropriated for their own use EMC's drawings and other proprietary information vital to the

production of printed circuit slip ring assemblies. According to EMC, those drawings constituted a trade secret. EMC sought an accounting, damages and preliminary and permanent injunctions.

A jury trial was held before Judge Eginton in July 1984. Arnold Pollack, President of EMC, testified that prior to 1969 Breeze was the sole producer of printed circuit slip ring assemblies in the United States. In 1969, EMC went into that business by purchasing Breeze's slip ring division. EMC's primary objective, according to Pollack, was to acquire Breeze's drawings, which would enable it to produce printed circuit slip ring assemblies without having to make the large investment otherwise necessary to develop the essential technology. EMC officials testified that the drawings purchased from Breeze bore a proprietary label and that, after acquiring the drawings, EMC restricted access to them in order to protect its investment.

Further, from the testimony of Eccles and other officials, EMC established that Wendon, despite its ability to produce conventional slip rings, had had little success in producing printed circuit slip ring assemblies prior to 1974. Wendon produced one or two such assemblies in 1964 and several others in 1968, but received no repeat orders. In 1967, Wendon contracted with Sperry Rand Corporation to produce printed circuit slip ring assemblies, but Wendon was unable to fill that order, and it ultimately sued Sperry, claiming that Sperry had failed to provide it with "a sufficient number of legible drawings and unambiguous specifications." Eccles also admitted that at the time he arrived at Wendon in February 1974, the company had no orders for printed circuit slip ring assemblies and had had none since at least 1972.

In contrast, about six months after Eccles' arrival, Wendon issued a catalog depicting a line of printed circuit slip ring assemblies, which EMC officials testified resembled those produced by EMC. Eccles conceded that Wendon had never manufactured those printed circuit slip ring assemblies prior to the issuance of the catalog in

September 1974. Subsequent to the catalog's issuance, however, according to sales invoices that EMC put in evidence, Wendon produced and sold over $2 million worth of printed circuit slip ring assemblies, subassemblies, and component parts, making it only the second U.S. producer of that equipment. Further, Wendon conceded that its actual sales were greater than those indicated by the invoices.

Pollack, EMC's president, also testified that in 1978 Wendon, in response to an order referring only to an EMC part number, produced a printed circuit slip ring part that fit perfectly into an assembly produced by EMC. According to Pollack, Wendon could not have done that without access to EMC's manufacturing drawings.

Finally, EMC established, through the testimony of Eccles and Julius Bogdan, Wendon's president, that Wendon acquired during 1975 and 1976 eight sets of EMC drawings, at least some of which related to the manufacture of printed circuit slip ring assemblies and component parts.

In its defense, Wendon sought to explain its acquisition of those drawings: Eccles testified that Wendon received them from Breeze for the sole purpose of enabling Wendon to manufacture replacement parts for slip ring assemblies that Breeze had produced prior to 1969. According to Bogdan, Wendon, aided by the drawings, produced $15,791 worth of replacement parts for former Breeze customers. Eccles claimed that Wendon subsequently returned the drawings to Breeze, although he conceded that Wendon copied at least some of them.

In addition, Bogdan claimed that Wendon's production of printed circuit slip ring assemblies during the 1960's established that Wendon was capable of producing those assemblies without access to EMC's drawings. He also testified that Wendon had long manufactured the slip ring assemblies depicted in the 1974 catalog, but that it had done so using conventional slip rings rather than printed circuit slip rings. However, EMC officials countered with testimony that because of substantial design dif-

ferences, a conventional slip ring assembly could not be converted into a printed circuit slip ring assembly by the mere inclusion of a printed circuit board.

Wendon also endeavored to establish that the technology necessary to the production of printed circuit slip ring assemblies was fully discussed in trade publications during the 1960's and had been known to the entire industry since at least 1964. However, Wendon was unable to produce any article that, in fact, supported this claim.

The jury, in response to separate interrogatories, found that Eccles had not wrongfully acquired any drawings owned by EMC, but that Wendon had; that the misappropriated drawings were trade secrets; and that Wendon's misappropriation injured EMC in the amount of $375,000. After judgment was entered on July 20, 1984, Wendon moved for judgment n.o.v., and, alternatively, for a new trial. On January 23, 1985, Judge Eginton denied Wendon's motions, without opinion.[1]

On appeal, Wendon argues, among other things, that the evidence does not support the jury's findings that EMC's ability to produce printed circuit slip ring assemblies constituted a trade secret, and that Wendon wrongfully acquired that trade secret. We find no merit in these arguments.

■ As shown by our recital of the evidence at trial, there was ample evidence to support the jury's finding that EMC's drawings conferred an advantage on EMC which its competitors did not share. Accordingly, those drawings constituted a trade secret. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 474–75, 94 S.Ct. 1879, 1882–83, 40 L.Ed.2d 315 (1974); *A.H. Emery Co. v. Marcan Products Corp.*, 389 F.2d 11, 16 (2d Cir.1968).

■ Similarly, we have no trouble concluding that a rational fact-finder could find that Wendon misappropriated EMC's trade secret. The circumstantial evidence of misappropriation is substantial. Wendon, which had been able to produce only a few printed circuit slip ring assemblies of questionable quality prior to employing Eccles, issued a catalog depicting an entire line of printed circuit slip ring assemblies, resembling those built by EMC, and began producing those assemblies in increasing quantities soon after it hired Eccles away from EMC. In addition, Wendon conceded at trial that it received, at about the same time it began to produce large quantities of printed circuit slip ring assemblies, certain of EMC's drawings pertaining to the manufacture of those assemblies.

It is true, as Wendon emphasizes, that EMC failed to establish the precise nature of the drawings Wendon acquired. The evidence also showed that Wendon had begun to produce a small number of printed circuit slip ring assemblies in late 1974 and early 1975, even before its admitted receipt of some of EMC's drawings. However, from the evidence, the jury might reasonably have inferred that Wendon had access to other drawings besides those it admitted receiving or to other sources of information about EMC's trade secrets.

Wendon also argues that the jury verdict, imposing liability on Wendon but not on Eccles, is inconsistent. We disagree. The case against Wendon, the corporate defendant, does not rest exclusively on evidence that Eccles, the individual defendant, acted improperly. The evidence against Eccles consisted only of his concession that he acquired from Breeze in 1975 and 1976 eight sets of EMC drawings, and that Wendon used these drawings to manufacture spare parts for slip rings produced by Breeze. Because EMC never established at trial the precise content of the drawings Eccles received, however, it was unable to demonstrate that these particular drawings led to Wendon's sudden ability to produce the slip ring assemblies—which, in fact,

---

1. EMC had also moved to amend the judgment, seeking, in addition to compensatory damages, punitive damages, an accounting, prejudgment interest and an injunction. Judge Eginton directed a Special Master to resolve the motions, but on January 9, 1985, EMC withdrew its motions.

Wendon acquired in *1974*. Therefore, the jury may reasonably have doubted whether the drawings actually contained information regarding the manufacture of slip ring assemblies; these doubts, consequently, may have led the jury to conclude that the evidence of Eccles' guilt was insufficient.

On the other hand, even excluding the evidence against Eccles, the evidence against Wendon establishes beyond dispute that Wendon *somehow* acquired certain of EMC's secret manufacturing drawings and used them to its commercial advantage. EMC's failure to show exactly how the drawings got to Wendon and which of Wendon's employees were involved does not in any way diminish the strength of the case against Wendon. Because the record discloses ample "evidence upon which the jury could hold" Wendon liable independent of the conduct of Eccles, the jury verdict must stand. *Stivers v. George Washington University*, 320 F.2d 751, 753–54 (D.C.Cir.1963). *See also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.").

Wendon also contests the damage award, arguing that EMC failed to prove that it suffered injury as a result of Wendon's conduct and that, even assuming sufficient proof of injury, the evidence of damages— invoices reflecting Wendon's sales of printed circuit slip ring assemblies and component parts between 1974 and 1984—does not support an award of $375,000. In addition, Wendon asserts that the admission of the invoices at an early stage of the trial, before EMC had introduced any evidence showing misconduct on Wendon's part, was prejudicial because the invoices lent credibility to EMC's claims at the outset.

■ We find no merit in Wendon's claim that EMC failed to prove injury. The evidence showed that EMC and Wendon are the only United States companies capable of producing printed circuit slip ring assemblies. Obviously, Wendon's sales of those assemblies came at the expense of EMC. We also see no merit in Wendon's claim that the early admission of the invoices was improper. As Wendon concedes, in cases of this sort, damages encompass profits unjustly earned by the defendant. *See* 2 R. Milgrim, *Milgrim on Trade Secrets*, § 7.08[3] (1984); *Timely Products Corp. v. Arron*, 523 F.2d 288, 304 (2d Cir. 1975). The invoices were highly relevant and admissible any time during the trial, in the discretion of the trial judge.

■ The damage award of $375,000 is adequately supported by the evidence. It is true that EMC had the burden of proving its damages with reasonable certainty, *see Yentsch v. Texaco, Inc.*, 630 F.2d 46, 59 n. 19 (2d Cir.1980), but it was not obligated to offer a mathematically precise measurement of those damages. Where, as here, there is a clear showing of injury that is not susceptible to exact measurement because of the defendant's conduct, the jury has some latitude to "make a just and reasonable estimate of damages based on relevant data." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). The admitted invoices, establishing sales of $2,043,-579, along with Eccles' testimony that Wendon made a 15% profit on those sales, support an award of over $300,000. In addition, Eccles conceded that Wendon made other sales, not reflected in the invoices. Although, Eccles claimed that the unrecorded sales were "minimal" in amount, the admission that there were such sales was sufficient to permit the jury to make some additional award of damages. The addition of about $75,000 to the fully proven damages of $300,000 was reasonable and proper.

■ Finally, in our view, it was appropriate to compute damages based on Wendon's sales of all equipment involving printed circuit slip rings, not, as Wendon advocates, just on its sales of the slip rings themselves. Undoubtedly, all of the sales depended on Wendon's ability to manufacture the equipment using printed circuit slip rings.

We have examined Wendon's remaining claims and find them without merit.

Affirmed.