ACCEPTED
03-17-00035-CV
21631643
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/5/2018 11:20 AM
JEFFREY D. KYLE
CLERK

No. 03-17-00035-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/5/2018 11:20:33 AM
JEFFREY D. KYLE
Clerk

DR. RUTHIE HARPER AND PLLG, LLC,
*Appellants*,

v.

WELLBEING GENOMICS PTY LTD.,
*Appellee.*

On Appeal from the 98th Judicial District Court
Travis County, Texas, Cause No. D-1-GN-14-002452

SUPPLEMENTAL BRIEF OF APPELLEE WELLBEING GENOMICS PTY LTD.
FILED IN RESPONSE TO THE COURT'S REQUEST AT ORAL ARGUMENT

Robert W. Kantner
State Bar No. 11093900
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone: (214) 969-3737
Facsimile: (214) 969-5100
rwkantner@jonesday.com

ATTORNEY FOR APPELLEE

NAI-1503303499v1

TABLE OF CONTENTS

**PAGE**

Record References ....................................................................................................iv

Introduction ...........................................................................................................1

Factual Background .................................................................................................1

    A.     Defendants' Access to Trade Secret No. 1..........................................1

    B.     Defendants' Misappropriation of Trade Secret No. 1 and
          PLLG's Breach of Confidentiality Agreement ....................................4

Argument.................................................................................................................6

    A.     Proof of Access to Trade Secret No. 1 by Harper and PLLG..............6

          1.     Standard of Proof of Access to Trade Secrets ..........................6

          2.     Wellbeing's Evidence of Access to Trade Secret No. 1 by
                Harper and PLLG.................................................................13

    B.     Proof of Use or Disclosure of Trade Secret No. 1 by Harper and
          by PLLG .............................................................................................16

          1.     Standard of Proof of Use or Disclosure of a Trade Secret ......16

          2.     Wellbeing's Evidence of Use of Trade Secret No. 1 by
                Harper and PLLG.................................................................22

    C.     This Court Should Not Reverse the Judgment Based on Either
          Harper's or PLLG's Allegation of No Evidence or Insufficient
          Evidence of their Access to and Use/Disclosure of Trade Secret
          No. 1 ...................................................................................................25

Conclusion and Prayer .........................................................................................26

Certificate of Service ...........................................................................................28

# TABLE OF AUTHORITIES

**Page**

CASES

*Bishop v. Miller*,
412 S.W.3d 758 (Tex. App. – Houston [14th Dist.] 2013, no pet.) .......19, 20, 21

*Cain v. Bain*,
709 S.W.2d 175 (Tex. 1986) ...............................................................................25

*Electro-Miniatures Corp. v. Wendon Co., Inc.*,
771 F.2d 23 (2nd Cir. 1985) ..........................................................................11, 12

*GlobeRanger Corp. v. Software AG United States of America, Inc.*,
836 F.3d 477 (5th Cir. 2016) .........................................................................17, 21

*Leggett & Platt, Incorporated v. Hickory Springs Manufacturing Company*,
285 F.3d 1353 (Fed. Cir. 2002) .....................................................................10, 12

*Pioneer Hi-Bred Inc. v. Holden Foundation Seeds*,
35 F.3d 1226 (8th Cir. 1994) .........................................................................11, 12

*Sokol Crystal Products v. DSC Communications Corp.*,
15 F.3d 1427 (7th Cir. 1994) .........................................................................11, 12

*Spear Marketing, Inc. v. Bancorpsouth Bank*,
2014 WL 2608485 (N.D. Tex. June 11, 2014), *aff'd.* 791 F.3d 586
(5th Cir. 2015)................................................................................................8, 10

*Stratienko v. Cordis Corp.*,
429 F.2d 592 (6th Cir. 2005) ...............................................................................10

*SW Energy Production Co. v. Berry-Helfand*,
491 S.W.3d 699 (Tex. 2016) ................................................................................16

*Transp. Ins. Co. v. Moriel*,
  879 S.W.2d 10 (Tex. 1994)..................................................................................25

*Wellogix, Inc. v. Accenture, L.L.P.*,
  716 F.3d 867 (5th Cir. 2013) ................................................ 6, 7, 8, 10, 12, 18, 21

## RECORD REFERENCES

Appellee will use the same record reference designations as it did in its Brief of Appellee.

At the conclusion of the two week trial of this case, the jury found that Wellbeing Genomics Pty Ltd. ("Wellbeing") had proven that it had a trade secret in a grouping of DNA sequence variants (also called "SNPs") into one or more skin-related categories ("Trade Secret No. 1"). The jury also found that Dr. Ruthie Harper and PLLG, LLC ("PLLG") had misappropriated Trade Secret No. 1 and that PLLG had breached the confidentiality provision of its Exclusive Distributor Agreement with Wellbeing (PX019-0003-4) by misusing the information in Trade Secret No. 1. 1CR2975, 2978-9 and 2980. Wellbeing elected to recover against PLLG based on the contract claim. 1CR3267-8

This Supplemental Brief is provided – at the Court's invitation – to address questions posed by the Court during oral argument, namely what standard the Court should use to evaluate whether there is any evidence or sufficient evidence to support the jury's conclusion that Harper and PLLG had access to Trade Secret No. 1 and used or disclosed Trade Secret No. 1 without Wellbeing's permission.

## FACTUAL BACKGROUND

### A. Defendants' Access to Trade Secret No. 1

On appeal, Harper and PLLG assert that there is no evidence or insufficient evidence they ever received or had access to Trade Secret No. 1. For example, in their opening brief, Harper and PLLG asserted: "The record is crystal clear that Dr. Harper had never been provided anything like Slide 17 until trial." App.

Br. 31.   The slide 17 to which Harper and PLLG refer was one of the demonstrative slides that Wellbeing's technical expert, Dr. Michael Metzker, presented to the jury to illustrate Trade Secret No. 1:

STIP00073 (Metzger Slide No. 17) (App. 2).

What is an rs number?  The National Center for Biotechnology Information ("NCBI") assigns to each SNP that is identified a unique identifier called an rs number. Rs stands for "reference SNP."  Basically, the rs number provides the address of a particular SNP in the human genome. 4RR 111; 7RR 31.  Therefore the rs numbers in Metzker Slide No. 17 disclose the SNPs Wellbeing used in its test.  At a time when PLLG was selling Wellbeing's DNA test under the tradename

SKINSHIFT (6RR11), David Urman – who worked for Harper and PLLG – wrote to a potential new distributor as follows:

> SKINSHIFT is the first company to identify 16 SNPs that are relevant to skin health categories. Additional SNPs are being discovered as we speak. **The location of all of these SNPs will not be disclosed and will be treated as a trade secret.**

PX 46 (Emphasis added).

In response to Harper's and PLLG's contention that there is no evidence that they had access to Trade Secret No. 1, Wellbeing has cited the factual testimony of Stefan Mazy, the founder of Wellbeing and developer of Trade Secret No. 1, and the expert testimony of Dr. Metzker. Both Mazy and Metzker testified that the data cards Wellbeing provided to Harper and PLLG confidentially for each of the genes in Trade Secret No. 1 cited a small number of scientific articles (or references) that provided the rs numbers in Trade Secret No. 1. *See*, *e.g.*, citations to articles on the data cards at PX21-006, 9, 12 and 25, articles at PX2-448 and 525-7, Mazy's testimony at 5RR7-11 and Metzker's testimony at 7RR21 and 42-45.

The number of DNA variants in Wellbeing's Trade Secret No. 1 (fifteen) (one is used twice) is a very small percentage of the DNA variants found in humans on average (3.5 million). 7RR32. The average number of SNPs – DNA variants that appear in 1% or more of the population (7RR23-24) – is smaller than 3.5 million; but it is far larger than the number of SNPs in Trade Secret No. 1.

After all, Mazy testified that he considered 6,000 genes, each of which contain 500-1,000 SNPs, and closely evaluated 200 of them before selecting twelve for Trade Secret No. 1. As a result, Mazy analyzed thousands of SNPs before selecting fifteen (one to be used twice) for Trade Secret No. 1. PX26; 4RR83-86. Moreover, Mazy showed the jury a huge stack of the articles he read and still had at trial (20% of the total) that he relied upon to evaluate whether particular SNPs were associated with the skin health categories he had chosen. PX2; 4RR117-119. The number of articles cited on the data cards Wellbeing provided to Harper and PLLG is a very small fraction of the articles Mazy read. PX2.

Harper and PLLG had a test panel of SNPs by April 22, 2014 (PX 112) – about three months after Dr. Linda DiBella started work on the panel for them. (9RR 70-71). In contrast, looking for SNPs for a panel from scratch is like looking for proverbial needles in a haystack. That is why it took Mazy three years to develop Trade Secret No. 1. 4RR77.

B.  **Defendants' Misappropriation of Trade Secret No. 1 and PLLG's Breach of Confidentiality Agreement.**

On appeal, Harper and PLLG also argue that there is no evidence or insufficient evidence that either of them used or disclosed Wellbeing's Trade Secret No. 1. Harper argues that she did not use Trade Secret No. 1 to prepare patent applications on "Methods of Skin Analysis and Uses Thereof." PX153 and 149. PLLG argues that it developed its DNA test independently.

Wellbeing has responded to Harper's contention by citing Dr. Metzker's testimony that Harper used Trade Secret No. 1 to prepare her patent applications and that Harper's PCT application, which was published, disclosed Trade Secret No. 1. 7RR71, 143. Metker's conclusions are supported by the fact that David Urman, who worked for Harper and PLLG, sent Wellbeing data cards and "extended" data cards to Harper's patent attorney. PX291 and 295. Indeed, one of the Wellbeing extended data cards that Urman sent to Harper's patent attorney was copied into the PCT application. PX22, 153-0065-72. Metzker's opinions are also supported by the facts that the PCT application disclosed eleven of the twelve genes and eight of the fifteen SNPs in Trade Secret No. 1. 1 PX159; 7RR-51, 143 and 147. Harper did not object to Metzker's testimony.

Wellbeing has responded to PLLG's argument about the development of its SNP panel by citing the fact that Harper emailed to DiBella, whom PLLG hired to develop the SNP panel, Wellbeing data cards (one modified to add the rs number) and Wellbeing's list of its SNP functions. PX83. Wellbeing also relies on Dr. Metzker's testimony that DiBella, who had never previously created a DNA test, used Wellbeing's Trade Secret No. 1 to develop PLLG's DNA test. 7RR21-22. Metzker cited the fact that the original test panel Harper sent to Qivana, LLC to give to the new lab, Sorenson Genomics, had eight of Wellbeing's fifteen SNPs and Wellbeing had used one of those SNPs twice. PX112; 7RR64. Some of the

Wellbeing SNPs were dropped – but only because Sorenson could not quickly obtain the reagents needed to test for those SNPs. 7RR147-148; see also PX141. Again, no objection was made to Metzker's testimony.

<u>**ARGUMENT**</u>

**A.** <u>**Proof of Access to Trade Secret No. 1 by Harper and PLLG.**</u>

**1.** <u>**Standard of Proof of Access to Trade Secrets.**</u>

No one decision provides one specific standard for proof of access to a trade secret; but several courts have addressed the issue of the sufficiency of the plaintiff's proof of a defendant's access to trade secrets in issue under Texas law.

In *Wellogix, Inc. v. Accenture, L.L.P.,* 716 F.3d 867 (5th Cir. 2013), Plaintiff Wellogix, Inc. ("Wellogix") developed software that allowed oil companies to "plan, procure, and pay for complex services" online. The software included "dynamic templates" that adjusted cost and supply estimates based on "intelligence built into" the underlying source code. *Id.*, at 873. The Court of Appeals concluded that Wellogix had presented sufficient evidence to support the jury's finding that Defendant Accenture, LLP ("Accenture") had improperly acquired Wellogix's trade secrets, based on the following evidence:

> Wellogix showed: that it entered into six confidential agreements with Accenture; that through the marketing agreements, Accenture had access to Wellogix trade secrets; that Accenture also had access to Wellogix trade secrets uploaded to the confidential eTrans portal; and that an Accenture email referenced 'harvesting IP from Wellogix.'

*Id.*, at 876. The Court of Appeals rejected Accenture's argument that the testimony of Kendyl Roman, Wellogix's expert, was insufficient evidence that Wellogix's trade secrets were available on Wellogix's eTrans portal – to which Accenture had access. Roman had testified that – based on his experience in the software industry – he believed it likely that companies working together on a pilot project – like Wellogix and Accenture – would share documents containing trade secrets on an online portal. Roman also relied on a contractor's deposition testimony that information "resembling" Wellogix's trade secrets was on the eTrans portal. The Court of Appeals concluded that Roman's testimony was sufficient evidence of access:

> Given that 'an expert is permitted wide latitude to offer opinions,' *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786, and that, as discussed below, Roman's testimony was sufficiently 'reliable' and "relevant,' the jury was reasonable in crediting his testimony.

*Id.*

The Court of Appeals also rejected two other contentions by Accenture based on the testimony of Wellogix CEO Ike Epley. First, Accenture contended that Epley's testimony that one of Wellogix's pilot project partners, Trade Rangers, "had access" to Wellogix's source code did not support the "inferential leap" that Accenture had such access. Second, Accenture contended that Epley's testimony that the code was behind a firewall showed that it was not possible for Accenture

to access the trade secrets in the software. The Court of Appeals concluded that Accenture's involvement in the Trade Ranger pilot project as a consultant and implementer supported the inference that Accenture could have accessed Wellogix's source code through the pilot project. As for the firewall, the Court of Appeals stated that the jury could have inferred that Accenture "otherwise had access to" the code – for example by entering into confidentiality agreements.

Finally, the Court of Appeals rejected Accenture's reliance on the testimony of Wellogix's corporate representative, John Chisholm, that Wellogix never gave Accenture access to source code, stating: "we decline to assume 'jury functions' by weighing Chisholm's credibility against Epley's." *Id.*, at 876-877.

In *Spear Marketing, Inc. v. Bancorpsouth Bank,* 2014 WL 2608485 (N.D. Tex. June 11, 2014), *aff'd.* 791 F.3d 586 (5th Cir. 2015), the District Court found sufficient evidence of access but granted summary judgment to the defendants because there was insufficient evidence of use. Like *Wellogix, Spear* involved trade secrets in software – a program called VaultWorks that Plaintiff Spear Marketing, Inc. ("SMI") designed to help banks reduce the amount of cash – a nonearning asset – they hold in bank branches, ATMs and central vaults. SMI had licensed VaultWorks to Defendant BancorpSouth Bank ("BancorpSouth"). On April 6, 2010, SMI's President, Bill Spear contacted co-Defendant Argo Data Resource Corporation ("ARGO") to see if ARGO wanted to purchase SMI or enter

into a partnership with SMI. Subject to an agreement to treat SMI's disclosure to ARGO confidentially, SMI presented a demonstration of its technology to ARGO via an internet-telephone conference call involving Bill Spear and Todd Robertson, ARGO's Vice President and other representatives of ARGO.

Defendants BancorpSouth and ARGO moved for summary judgment. They contended that there was no evidence that they had used SMI's trade secrets in connection with ARGO's development of a competing program referred to as CIO. SMI responded by arguing that the motion should be denied because there was evidence of defendants' access to VaultWorks and because there were similarities between CIO and VaultWorks. The District Court found there was a genuine issue of material fact as to access. The evidence the District Court cited may be summarized as follows:

> 1. Defendants' implementation of ARGO's CIO at BancorpSouth, including:
>
>   a. Emails between Defendants with VaultWorks' screen-shots displaying cash data from certain BancorpSouth branches;
>
>   b. ARGO's Project Status Reports detailing the progress of CIO's implementation at BancorpSouth; and
>
>   c. An agenda for the CIO Kick-Off Meeting with slide containing screen-shots of VaultWorks.
>
> 2. Discussions between Bill Spear and Todd Robertson:

a. Robertson's internal email summarizing what he learned from Spear's demonstration on April 6, 2010; and

b. Spear's declaration about information conveyed to Robertson.

*Id.*, at 8.

Based on this evidence, the District Court decided that SMI had raised a genuine dispute regarding whether Defendants accessed "at least some" of SMI's trade secrets:

> A reasonable juror could find that ARGO had access to certain trade secrets connected to VaultWorks through BancorpSouth's somewhat detailed demonstration at the CIO Kickoff Meeting and Spear's declaration concerning his unrecorded demonstration of VaultWorks. The VaultWorks screen-shots also arguably gave ARGO access to certain trade secrets identified by SMI. Admittedly, the evidence of Defendants' access to SMI's specific trade secrets is hardly clear or concrete. But it seems sufficient at this point, given the somewhat relaxed evidentiary standard courts employ when analyzing the access element of this test.

*Id.*

Courts applying the trade secret law of other states agree with *Wellogix* and *Spear Marketing* that circumstantial proof of access to trade secrets is sufficient. *See, e.g. Stratienko v. Cordis Corp.*, 429 F.2d 592, 601 (6th Cir. 2005). ("In the case at bar, we assume that Dr. Stratienko produced sufficient evidence of access: Cordis' declarations demonstrate that Cordis, the entity that developed the Vista Brite 1G Catheter, had access to the information."); *Leggett & Platt, Incorporated*

*v. Hickory Springs Manufacturing Company*, 285 F.3d 1353, 1361 (Fed. Cir. 2002) ("L&P's evidence indicates that Hickory too had access to L&P's trade secrets through L&P's former employee Robert Hagemeister . . . . Hagemeister is a veritable repository of information on L&P products and designs. When hired by Hickory to design directly competing products, Hagemeister would be hard pressed to avoid disclosing such information."); *Sokol Crystal Products v. DSC Communications Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994). (" . . . [T]he simple fact that Sokol shipped its product to DSC would likely be sufficient evidence to sustain the jury's verdict" [that DSC had access to Sokol's trade secret]); *Pioneer Hi-Bred Inc. v. Holden Foundation Seeds*, 35 F.3d 1226, 1233 (8th Cir. 1994) ("Pioneer presented no direct evidence regarding how Holden obtained H3H/H43527. However, 'direct evidence of industrial espionage are rarely available and not required.'"); and *Electro-Miniatures Corp. v. Wendon Co., Inc.*, 771 F.2d 23, 26 (2nd Cir. 1985) ("It is true, as [Defendant] Wendon emphasizes, that [Plaintiff] EMC failed to establish the precise nature of the drawings Wendon acquired…. However, from the evidence, the jury might reasonably have inferred that Wendon had access to other drawings besides those it admitted receiving or to other sources of information about EMC's trade secrets.")

The cases cited above support at least the following standards for evaluation of the sufficiency of evidence of a defendant's access to trade secrets:

1. The plaintiff does not have to provide direct evidence that it delivered or made available all of the elements of a combination trade secret to the defendant in one document. *See Wellogix, Speer* and *Pioneer Hi-Bred*.

2. A finding of access may be based on circumstantial evidence such as the defendant's inability to develop the technology in question without access to plaintiff's trade secret(s) and/or a defendant's development of the technology in question after gaining access to the plaintiff's trade secrets. *See Speer Marketing*.

3. It is sufficient that the plaintiff proves the defendant likely had access to some of the trade secret information by virtue of the parties working together on a project. *See Wellogix, Speer* and *Electro-Miniatures*.

4. A defendant's use of data and documents generated by or relating to the trade secret(s) while working on a similar, competitive product will support a finding that the defendant had access to the trade secret(s). *See Speer Marketing*.

5. Indeed, a defendant's hiring of a former employee of the plaintiff who knows the trade secret(s) is sufficient. *See Leggett & Platt*.

6. Or the defendant's receipt of the plaintiff's product may be sufficient. *See Sokol*.

7. The court should not assume the jury's function of weighing the credibility of witnesses. *See Wellogix*.

8. An expert who has reviewed the file and whose opinion is deemed reliable should be given great latitude to testify about access. *See Wellogix*.

## 2. **Wellbeing's Evidence of Access to Trade Secret No. 1 by Harper and PLLG**

Wellbeing presented evidence of access to Trade Secret No. 1 by Harper and

PLLG, including the following.

1. Mazy provided data cards for each of the genes in Trade Secret No. 1 to Harper and PLLG. Each of the twelve data cards cited a small number of references that provided the rs numbers in Trade Secret No. 1. Indeed, one reference cited two rs numbers in its title. PX21; 5RR7-11. The rs numbers identify particular SNPs. 7RR31

2. PLLG included eight of Wellbeing's SNPs in the SNP panel if sent to Qivana to give to its lab, Sorenson. PX 112. The title of the first reference on Wellbeing's data card for the GPX1 gene was "The Mn-superoxide dismutase single nuecleotide polymorphism rs 4880 and the glutathione peroxidase 1 single nucleotide polymorphism rs 1050450 are associated with aging and longevity in the oldest old." PX21-0006. (App. 4) Wellbeing uses the SNP represented by rs 1050450 with regard to the GPX1 gene in two skin health categories: Firmness and Elasticity and Free Radical Damage. Wellbeing uses the SNP represented by rs4880 with regard to the SOD2 gene. Therefore, the article was also listed by Wellbeing as a reference on Wellbeing's data card for the SOD2 gene. PX-0025 Both of these SNPs were included in the panel of SNPs PLLG submitted to Qivana to give to Sorenson. PX112 The SNP represented by rs 1050450 was eliminated from Harper's "new" test, but only because Sorenson could not find a reagent needed to test for it. PX141

3. Mazy also cited references in Wellbeing's data cards that did not state the rs number in question in the title but did provide the rs number in the body of the article. For example, Mazy cited an article titled: "Leptin-Receptor Polymorphisms Relate to Obesity through Blunted

Leptin-Mediated Sympathetic Nerve Activation in a Caucasian Male Population." PX 2-0448; 5RR8; App. 5 This article is a reference in the data card for the LEPR gene. PX 21-00009 The article refers to three SNPs – represented by rs 1137100, rs 115701 and rs 179183. PX2-0450 The first SNP is used by Wellbeing. STIP00073 The second SNP was included in PLLG's "new" test. PX112

4. Another article Mazy cited was titled: "Two newly identified genetic determinants of pigmentation in Europeans." PX2-0505-7 (App. 6) It is a reference cited on Wellbeing's data card for the ASIP gene. PX2-0012 The article is only two and a half pages long. In a table on page 2, the article cites two and only two SNPs with respect to the ASIP gene – SNPs represented by rs 1015362 and rs 4911414. PX2-0506 These are the two SNPs Wellbeing uses with respect to the ASIP gene. PLLG included both SNPs in the SNP panel it sent to Qivana to give to Sorenson. PX112

5. Mazy cited additional examples of disclosures in the references of rs numbers for SNPs used in Wellbeing SkinDNA™ Test (5RR9-11) and further examples can be found in other articles. PX 2.

6. In at least one instance, there is direct evidence Harper or DiBella obtained an rs number for a Wellbeing SNP from a data card provided by Wellbeing. Plaintiff's Exhibit 178 was a screen shot of SNP information for the MMP-1 gene taken from the NCBI database that Mazy provided to Harper. It highlighted rs 1799750, a SNP Wellbeing used in its test. When Harper sent the extended data card for the MMP-1 to DiBella, who prepared a SNP panel for PLLG, Harper added this rs number to it. PX83

7. Moreover, Harper asked for Mazy's scientific references. On November 7, 2012, Harper wrote to Urman: "When we get the info from Stefan on SNPs, we want to complete journal articles so we are more informed about

them than anyone else . . . ." PX73 Urman understood that Harper was referring to the articles cited in Wellbeing's data cards. 6RR20 One day later, Urman wrote to Mazy: "Good morning! Can you get us the article for all of the SNPs that support the data cards?" PX99

8.  On average a human has 3.5 million DNA variants. SNPs are DNA variants that occur in 1% or more of the population. 7RR23-24. Each gene has between 500 and 1,000 SNPs. PX26. Mazy testified that he considered 6,000 genes and closely evaluated 200 of them before choosing twelve genes for Trade Secret No. 1. 4RR83-86. Therefore, Mazy considered thousands of SNPs. Moreover, Mazy showed the jury a huge stack of articles he read and still had at trial (20% of the total he read) that he relied upon to evaluate whether particular SNPs were associated with the skin health categories he had chosen. PX2; 4RR 117-119.

9.  The number of articles cited in the data cards was far smaller than the number of articles Mazy had read to develop his test. PX2; 4RR117-119. Moreover the data cards grouped the articles by gene. PX21 The fact that the DNA panel PLLG sent to Qivana contained eight of Wellbeing's SNPs is not a coincidence.

10. Harper and DiBella prepared a test panel of SNPs in three months. 9RR70-71. It took Mazy three years to develop Trade Secret No. 1. 4RR77

Dr. Metzker testified that Harper misappropriated Trade Secret No. 1 – based not only on the above-cited evidence (7RR21, 49-52, 57-61, 64-65, and 70-72), but also his opinions that neither Harper nor DiBella was qualified to develop a DNA test and certainly would not have been able to develop a DNA test in three

months without Trade Secret No. 1.  7RR53-57 and 65-69.  Harper and PLLG did not object to the admission of Metzker's opinions at trial.

**B.** **Proof of Use or Disclosure of Trade Secret No. 1 by Harper and by PLLG.**

    **1.** **Standard of Proof of Use or Disclosure of a Trade Secret.**

The District Court charged the jury on "use" of a trade secret as follows:

> "Use" means a commercial use by which a person seeks to profit from the trade secret.  Merely receiving trade secret information does not constitute "use" of a trade secret. Misappropriation does not require that the person use the trade secret in exactly the form in which the person received it; however, it must be substantially derived therefrom.  There is no misappropriation when the contribution of the trade secret is slight and the person's process can be said to have been derived from other sources.

(ICR2980)

This instruction was correct – and is not challenged on appeal by Harper or PLLG.  In *SW Energy Production Co. v. Berry-Helfand*, 491 S.W.3d 699 (Tex. 2016), the Supreme Court stated that "use" of a trade secret means "'commercial use by which the offending party seeks to profit from the use of the trade secret.'" *Id*., at 722 (quoting *Global Water One, Inc. v. Atchley*, 244 S.W.3d 924, 930 (Tex. App. – Dallas 2008, pet. denied).  The Supreme Court added that "use" of a trade secret includes relying on the trade secret "'to assist or accelerate research or development.'"  *Id*. (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 comt. c)

In *GlobeRanger Corp. v. Software AG United States of America, Inc.*, 836 F.3d 477 (5th Cir. 2016) (applying Texas law), the Court of Appeals commented on the above statements by the Texas Supreme Court in *Southwestern Energy* as follows:

> *Southwestern Energy* thus removes any doubt that Texas follows this principle of "traditional trade secret law," which recognizes that if the concept of use "were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections the law provides would be hollow indeed."

*Id.*, at 498-499.

In *GlobeRanger*, the Court of Appeals held that GlobeRanger Corp. ("GlobeRanger") had provided sufficient evidence to show that Software AG US of America, Inc. ("Software AG") had used GlobeRanger's Navy Solution, a radio frequency identification ("RFID") technology, to develop its own product. The Court of Appeals cited the following evidence:

> Software AG accessed implementations of the Navy Solution; received confidential system keys under the pretense of maintenance; acknowledged trying to replicate GlobeRanger's functionality and obtained confidential source code from a former GlobeRanger employee in order to figure out how the technology worked, all while it was in the process of making its own product to perform similar functions.

*Id.*, at 499. In short, the Court of Appeals accepted evidence of defendant's access to plaintiff's trade secrets while developing a competing product to perform similar

functions. It did not require evidence that defendant's product was the same as or even substantially similar to plaintiff's product.

Moreover, in *GlobeRanger*, the Court of Appeals cited its prior decision on this point in *Wellogix, Inc. v. Accenture, L.L.P.*, *supra* (applying Texas law). Wellogix presented evidence that Accenture and its partner, SAP, had been able to access Wellogix's dynamic templates source code that had been uploaded to a confidential eTrans portal. The Court of Appeals cited that evidence and an Accenture document stating that its software had to have similar or better technology than Wellogix and other Accenture documents referencing Wellogix's templates as supporting the jury's conclusion that Accenture used Wellogix's trade secrets. *Id.*, at 877.

In *Wellogix*, the Court of Appeals also addressed Accenture's arguments that: (1) its templates lacked "dynamic" features and therefore were "nothing like Wellogix's;" and (2) "Wellogix doesn't own the concept of templates." Similarly, PLLG has argued that its DNA test looks different than Wellbeing's DNA test, which utilizes Trade Secret No. 1, and that Wellbeing does not own the concept of DNA testing to determine skin treatments. In *Wellogix*, the Court of Appeals rejected these arguments:

> However, the standard for finding "use" is not whether Accenture's templates contained Wellogix trade secrets, but whether Accenture "rel[ied] on the trade secret[s] to assist or accelerate research or development of its templates. *HAL*, 500

> F.3d at 451 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40). A jury could "legitimate[ly] infer[,]" *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097, on the basis of, for example, the Accenture email suggesting that the company should "[u]se Wellogix for content," that Accenture "rel[ied]" on Wellogix's templates to develop its own. *See HAL*, 500 F.3d at 451.

*Id.*, at 877-8.

A Texas Court of Appeals has also considered this sufficiency of evidence of use of a trade secret question. In *Bishop v. Miller*, 412 S.W.3d 758 (Tex. App. – Houston [14th Dist.] 2013, no pet.), Plaintiffs William Bishop and Pinnacle Potash International, Ltd. ("Pinnacle") asserted that thirteen pieces of information on a list of Bishop's technical plans for mining for potassium in a region of Utah known as The Ten Mile Area were trade secrets. Bishop and Pinnacle further asserted that a compilation of one or more of those items was also a trade secret. The jury found that three of the items and a compilation of them were trade secrets and that those trade secrets were misappropriated by Defendants E. Barger Miller and Reunion Potash Company ("Reunion").

Regarding use, the Court of Appeals found there was evidence that Reunion had "used" Bishop's trade secrets in two ways. First, Miller used the trade secrets to attempt to entice a third party into investing money in Reunion to develop the subject mining leases. Second, Reunion used the trade secrets to develop an

Operating Plan for the development of the one acre. The Court of Appeals' comments on the latter finding are most relevant to Wellbeing's case.

Bishop conceded that Reunion's Operating Plan did not copy his plan, which was based on his trade secrets, "in toto"; but Bishop asserted that Reunion's Operating Plan was "very similar" to his and used "major pieces of his plan." *Id.*, at 773. Bishop's technical expert witness, Kenneth Mills, broke Bishop's plan into twenty-one component parts and concluded that Reunion's Operating Plan incorporated fifteen of those components, and either modified or discarded the remaining six components. Mills further testified that without the "Bishop Plan" Reunion's modifications would never have been done. *Id.*, at 774.

Regarding Bishop's testimony, the Court of Appeals observed that the unauthorized use of a trade secret "need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability." *Id.* (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 comt. c) Regarding Mills' testimony, the Court of Appeals stated:

> ("[T]he actor need not use the trade secret in its original form. Thus, an actor is liable for using the trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret.").

*Id.* (again quoting comment c.)

The Court of Appeals noted that the three trade secrets found by the jury were among the components of the Bishop Plan that Reunion had modified, but the

Court cited Mills' testimony that the modifications in Reunion's Operating Plan would never have been made if not for Reunion's use of Bishop's trade secrets as supporting the jury's finding of misappropriation. *Id.*, n. 20.

In the end, the Court of Appeals concluded that the similarities between Bishop's and Reunion's plans and Mills' testimony regarding Reunion's modifications was sufficient evidence to support the jury's finding of misappropriation stating: "The evidence was such that reasonable and fair minded people could reach the verdict the jury reached in this case." *Id.*, at 775.

In conclusion, with regard to evaluating a defendant's alleged use of a trade secret *GlobeRanger*, *Wellogix*, and *Bishop* offer the following standards:

1. "Use" of a trade secret means any commercial use by which a person seeks to profit from the trade secret. *See GlobeRanger. See also Southwestern.*

2. A plaintiff need not introduce direct evidence of a defendant's use of a trade secret. Evidence, even circumstantial evidence, of a defendant's access to the alleged trade secret and intention to develop similar technology will suffice. *See GlobeRanger.*

3. A defendant's product need not contain the trade secret. If the defendant relied upon the trade secret to assist or accelerate its research, that is a use that supports a finding of misappropriation. *See Wellogix.*

4. Unauthorized use need not extend to every aspect, feature or component of a trade secret. It is sufficient if the defendant's technology or product is substantially derived from the plaintiff's trade secret(s). *See Miller.*

The District Court's charge to the jury on the definition of "use" of a trade secret conforms to these standards.

**2. Wellbeing's Evidence of Use of Trade Secret No. 1 by Harper and PLLG.**

**a. Evidence of Use of Trade Secret No. 1 by Harper**

Wellbeing presented evidence Harper used Trade Secret No. 1 to prepare her patent applications, including the following:

1. Harper had access to Trade Secret No. 1. See above.

2. David Urman, who worked for Harper and PLLG, sent Wellbeing data cards and "extended" data cards to Harper's patent prosecution counsel. PX291 and 295.

3. Wellbeing's "extended" data card for the MMP-1 gene was inserted into Harper's provisional patent application and Harper's PCT application (minus Mazy's citations to scientific articles.) PX22 and 153-0065-72, 159-0041.

4. Harper's PCT patent application disclosed eleven of the twelve genes in Trade Secret No. 1 PX159; 7RR51.

5. Harper's PCT application disclosed twelve of the fifteen SNPs in Trade Secret No. 1. 7RR143. Table 2 alone disclosed eight of the SNPs in Wellbeing's test.

6. Harper's PCT application disclosed the Wellbeing SNPs it disclosed in the same skin health categories as Trade Secret No. 1. 7RR146. There were many other skin health categories that Wellbeing or Harper and PLLG could have used. 4RR109; 7 RR 33-34.

Based upon these facts and his review of all of the documents produced in the case and all of the testimony in the case, Dr. Metzker testified that Harper's patent applications contained and disclosed Wellbeing's Trade Secret No. 1 and

that the publication of Harper's PCT application destroyed Trade Secret No. 1. 7RR71, 143. Harper and PLLG did not object to the admission of this testimony by Metzker.

Moreover Harper and PLLG *used* Harper's provisional patent application to obtain an Exclusive Distribution Agreement with Qivana. At the outset of the parties' negotiations, Urman sent Harper's provisional patent application to Qivana. PX57; 8RR127. Justin Banner, a founder of and key decision-maker for Qivana testified he was looking for a unique skin care product for Qivana to distribute. Banner further testified that in order to obtain a patent one has to have something that is unique. Therefore, Banner concluded that PLLG likely had a unique skin care product line – exactly what Qivana was looking for. 8RR127. Ultimately, Qivana licensed Harper's patent-pending technology as part of its agreement with PLLG. PX128-002 and 3-5.

### b. Evidence of Use of Trade Secret No. 1 by PLLG.

Wellbeing presented evidence of PLLG's use of Trade Secret No. 1 to develop its SNP panel for a DNA test, including the following:

1. PLLG had access to Trade Secret No. 1. See above.

2. PLLG hired Dr. Linda DiBella to help develop a SNP panel for its DNA test. 10RR25. Harper sent Wellbeing data cards and a list of each gene in Trade Secret No. 1 and its function to DiBella. PX83.

3. DiBella had no prior experience developing a DNA test. 9RR70.

4. DiBella started work on an SNP panel on January 18, 2014. 9RR70-71. By April 22, 2014, DiBella had prepared a SNP panel. PX112.

5. PLLG sent the SNP panel DiBella prepared to Qivana to give to the new testing laboratory run by Sorenson Genomics, LLC. PX112.

6. The SNP panel that PLLG sent to Qivana to give to Sorenson included eight of the fifteen SNPs in Trade Secret No. 1. STIP00073; PX112.

7. The reason some of those SNPs did not end up in the SNP panel Sorenson used is that Sorenson found many of the reagents it needed to use to identify the SNPs were not readily available. 7RR147-148. For example, in one email Lars Mouritsen, the Chief Scientific Officer of Sorenson, sent to Harper and Urman shortly after receiving PLLG's proposed SNP panel, Mouritsen listed three Wellbeing SNPs for which reagents were not immediately available. PX141.

8. In total, DiBella spent about 100 hours on PLLG's SNP panel. 9RR71. In contrast, Mazy spent thousands of hours over three years to develop Wellbeing's SNP panel which is Trade Secret No. 1. 4RR77-78.

9. Harper, PLLG and DiBella did not produce detailed work papers like Mazy did. PX1, 2, 4 and 7.

Based on this evidence, Dr. Metzker testified that PLLG had used Trade Secret No. 1 to develop its SNP panel. Specifically, Metzker testified that PLLG used Trade Secret No. 1 as the "starting point" to develop its test panel. 7RR149. PLLG did not object to this testimony by Metzker.

**C.** **This Court Should Not Reverse the Judgment Based on Either Harper's or PLLG's Allegation of No Evidence or Insufficient Evidence of their Access to and Use/Disclosure of Trade Secret No. 1.**

Per the standards established by the above-cited cases, there is plenty of evidence to support the jury's findings that Harper and PLLG misappropriated Wellbeing's Trade Secret No. 1. The evidence summarized above, including the opinion testimony of Wellbeing's technical expert, Dr. Metzker, was admitted without objection by Harper and PLLG. The evidence is far more than the proverbial scintilla of evidence because it was sufficient to enable reasonable and fair minded people to conclude Harper and PLLG misappropriated Trade Secret No. 1. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994). During oral argument, Harper's and PLLG's counsel argued that in addition to their no evidence contentions they also asserted that the evidence was insufficient. As this Court well knows, it "must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). That is not the case here. Indeed, while Harper's and PLLG's expert, Dr. Carlos Bustamante, contested Wellbeing's contention that Trade Secret No. 1 was in fact a trade secret, he did not contest Wellbeing's contentions that Harper and PLLG had access to and used and disclosed Trade Secret No. 1.

## CONCLUSION AND PRAYER

For the above reasons, and for the reasons stated in Wellbeing's Brief of Appellee, this Court should affirm the Judgment of the District Court.

Respectfully submitted,


/s/ Robert W. Kantner
State Bar No. 11093900
rwkantner@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone: (214) 220-3737
Facsimile: (214) 969-5100

**ATTORNEY FOR APPELLEE WELLBEING GENOMICS PTY LTD.**

## CERTIFICATE OF SERVICE

On January 5, 2018, I electronically filed this brief with the Clerk of the Court using the eFile.TXCourts.gov electronic filing system which will send notification of such filing to the following (unless otherwise noted below).

Marcy Hogan Greer
State Bar No. 08417650
mgreer@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

William T. ("Tommy") Jacks
State Bar No. 10452000
jacks@fr.com
David S. Morris
State Bar No. 24032877
dmorris@fr.com
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
Telephone: (512) 472-5070
Facsimile: (512) 320-8935

*Attorneys for Appellants*

/s/ Robert W. Kantner
Robert W. Kantner